**UPIC & CO. and United Pacific Life Insurance Company, Plaintiffs,**

**v.**

**KINDER–CARE LEARNING CENTERS, INC., Defendant.**

**No. 91 Civ. 0591 (SWK).**

United States District Court, S.D. New York.

May 15, 1992.

Eric J. Lobenfeld (Dewey Ballantine, of counsel) by Paul R. Oppold, New York City, for plaintiffs.

Davis Polk & Wardwell by Thomas P. Ogden, New York City, for defendant.

## MEMORANDUM OPINION AND ORDER

KRAM, District Judge.

Plaintiffs UPIC & Co. and United Pacific Life Insurance Company are, respectively, the registered holder and beneficial owner of $12 million of subordinated notes issued by defendant Kinder–Care Learning Centers, Inc. ("KCLC"), and bring this action to recover principal and interest due under the notes.[1] Defendant KCLC now moves, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing the complaint for failure to state a claim upon which relief can be granted, and, pursuant to Rules 12(b)(7) and 19, for dismissal of the complaint for failure to join a party needed for a just adjudication.

## BACKGROUND

Pursuant to an indenture[2] dated December 23, 1987 (the "Indenture") and qualified under the Trust Indenture Act of 1939,[3] 15 U.S.C. § 77aaa *et seq.* (the "TIA" or "Act"), between KCLC as obligor and Amsouth Bank N.A. as Indenture Trustee, KCLC issued certain senior subordinated reset notes, including three-year subordinated notes (the "Notes" or "Securities"). Pursuant to a Securities Purchase Agreement also dated December 23, 1987 (the "Agreement"), UPIC purchased and became the registered holder of $12 million in principal amount of the Notes.

Under the terms of the Notes, KCLC was obligated to pay semi-annual interest on the outstanding principal of the Notes until such time as the principal had been paid in full. Under the terms of the Indenture, KCLC also was obligated to reset the rate of interest payable on the Notes on December 15, 1990 (the "Reset Date"), and to give notice of the new rate to registered holders of the Notes (the "Noteholders" or "Securityholders") within 30 days after that date.

On or about the Reset Date, KCLC provided to the Noteholders, including UPIC, notice of the reset interest rate on the Notes. KCLC also provided to the Noteholders notice of the provisions of the Notes and Indenture that require KCLC, at the Noteholders' option, on or within 30 days after the Reset Date (the "Buy–Back Period"), to repurchase the Notes for their outstanding principal amount, together with accrued interest (the "Repurchase Option").

During the Buy–Back Period, UPIC elected to exercise the Repurchase Option and provided timely notice to KCLC of its election. KCLC failed to repurchase the Notes as demanded by UPIC. As a result, the $12 million principal amount of the Notes held by UPIC, together with accrued interest, became due and owing as of January 14, 1991. KCLC also failed to pay interest due on the Notes as of the Reset Date (December 15, 1990), in the amount of

---

1. Plaintiffs are referred to collectively as "UPIC."

2. A "trust indenture" is a contract entered into between a corporation issuing bonds or debentures and a trustee for the holders of the bonds or debentures, which, in general, delineates the rights of the holders and the issuer. *See* William J. Bratton, Jr., *The Interpretation of Contracts Governing Corporate Debt Relationships,* 5 Cardozo L.Rev. 371 (1984).

   There is no clear or consistent historical distinction in usage among the terms "bond," "debenture," "note," and "security," in describing long-term debt securities. Nevertheless, certain conventions have arisen which may be helpful in distinguishing between those long-term debt securities issued pursuant to an indenture and those which are not, and those which are secured by a lien on some or all of the issuer's assets and those which are not. *See* American Bar Foundation, *Commentaries on Model Debenture Indenture Provisions* 7 n. 3, 8 (1971).

3. An indenture "qualified" under the Trust Indenture Act of 1939 is an indenture which complies with the Act's substantive requirements, *see* 15 U.S.C. §§ 77jjj–77rrr, and under which a security has been issued, concerning which the required registration statement has been filed and has become effective. *See* 15 U.S.C. §§ 77ccc(9), 77eee(b), 77iii(a) (West Supp.1992).

$780,000, and has failed to pay accrued interest on such sum.

The complaint in this action alleges two claims. On the first, UPIC seeks to recover the $780,000 in interest due and payable as of the Reset Set, together with accrued interest; on the second, UPIC seeks to recover the $12 million principal amount of the Notes due and payable under the Repurchase Option, together with accrued interest.

KCLC now moves to dismiss the complaint on three grounds. First, KCLC contends that under the Indenture a Noteholder's right to payment of the principal of and interest on the Notes is "completely" subordinated to the prior payment of the entirety of KCLC's senior indebtedness; since UPIC does not allege prior payment of KCLC's defaulted senior indebtedness, it fails to state a claim upon which relief can be granted under New York law. Second, UPIC lacks standing to commence this action having failed to provide the Indenture Trustee the 60–days written notice required by the Indenture. Third, UPIC's failure to join the Indenture Trustee warrants dismissal given the Indenture Trustee's fiduciary obligation to all subordinated noteholders under the Indenture, and the possibility of KCLC incurring inconsistent obligations by being required to make direct payment to the plaintiffs notwithstanding its obligation to senior creditors under the Indenture (the "holders of Senior Indebtedness").

Subsequent briefing, however, indicates that KCLC's position is qualified. KCLC does not dispute that TIA Section 316(b) grants UPIC the "procedural right" to commence this action at least with respect to interest due on the Notes, and admits that the Indenture's notice provision requiring 60–days written notice to the Trustee of an event of default under the Indenture "may be overridden by the right to sue provisions of Section 5.07 [of the Indenture] with respect to UPIC's claim for $780,000 in overdue interest." KCLC argues, however, that although the TIA guarantees UPIC the "procedural right" to bring this action it does not automatically permit UPIC to reduce its claims on the Notes to judgment since the issue of "[w]hether a judgment may be obtained depends on the substantive provisions of the relevant instruments and state law …." KCLC Sur–Sur–Reply Letter–Brief dated May 29, 1991. And, according to KCLC, because the TIA applies only to UPIC's claim for payment of interest on the Notes, and not to UPIC's claim for failure to repurchase the Notes pursuant to the Indenture's "special" repurchase provisions, UPIC lacks standing with respect to their $12 million repurchase claim, having failed to give the required notice to the Trustee under Indenture Section 5.06.

In opposition, UPIC acknowledges the Indenture's subordination provisions but argues that TIA Section 316(b) grants it the unfettered right to bring an action to enforce the Notes notwithstanding provisions of the Indenture or state law to the contrary. Specifically, UPIC contends that the TIA guarantees its right to have its claim reduced to judgment and that KCLC's basic premise—that UPIC seeks to negate the Indenture's subordination provisions—is erroneous since the Indenture's subordination provisions are activated, if at all, only when UPIC seeks to enforce its judgment. UPIC argues alternatively that, should the Court reach the issue of whether the Indenture provides for "complete" or "inchoate" subordination,[4] the Indenture

---

**4.** To the extent that it may be profitable to do so, one may identify two basic types of subordination agreements. The "inchoate" subordination

> is so drawn that it does not become operative until a voluntary or involuntary distribution of assets of the debtor is made to its creditors; the specific event which triggers the subordination, such as bankruptcy or insolvency, will be specified in the agreement. Until such financial distress occurs, the subor-

dinated debt may be amortized, payments may be made to a sinking fund therefor, or the subordinated debt may be redeemed or refunded by the debtor through other means, subject only to the specific limitations imposed by the instrument providing for or evidencing such debt…. [T]he inchoate agreement may be made more stringent, for example, by prohibiting payments to the subordinator during the continuance of any default in

provides for "inchoate" subordination, permitting it to bring suit and obtain a judgment notwithstanding KCLC's failure to satisfy its senior indebtedness.

## DISCUSSION

### I. *Motion to Dismiss for Failure to State a Claim*

■ When evaluating a motion to dismiss under Rule 12(b)(6), the allegations of the complaint are to be construed in the light most favorable to the plaintiff and accepted as true, *see Scheuer v. Rhodes*, 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), and a complaint shall not be dismissed unless it appears that the plaintiff can prove no set of facts entitling it to relief. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Cortec Industries, Inc. v. Sum Holding L.P.*, 949 F.2d 42 (2d Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992). In reviewing a pleading on a motion to dismiss under Rule 12(b)(6), the Court generally looks only to the pleading itself. *See* Fed.R.Civ.P. 12(b); *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774 (2d Cir.1984). In determining whether UPIC's claims may be subject to dismissal, however, the Court may properly refer to the Indenture and its exhibits (including the Notes) which are annexed to KCLC's notice of motion and are integral to UPIC's claims. *See Field v. Trump*, 850 F.2d 938, 949 (2d Cir.1988), *cert. denied*, 489 U.S. 1012, 109 S.Ct. 1122, 103 L.Ed.2d 185 (1989).

### A. Trust Indenture Act Section 316(b)

Section 316(b) of the TIA, 15 U.S.C. § 77ppp(b), entitled "prohibition of impairment of holder's right to payment," pro-

scribes certain so-called "majority action clauses" in indentures to be qualified under the Act. Section 316(b) expressly prohibits use of an indenture that permits modification by majority securityholder vote of any core term of the indenture, i.e., one affecting a securityholder's right to receive payment of the principal of or interest on the indenture security on the due dates for such payments:

> Notwithstanding any other provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder....

\*　　\*　　\*　　\*　　\*　　\*

15 U.S.C. § 77ppp(b). The Indenture itself incorporates the requirement of TIA Section 316(b) in its Section 5.07, which provides:

> The right of any Holder of a [Note] to receive payment of principal of and interest on the [Note], on or after the respective due dates expressed in the [Note] or to bring suit for the enforcement of any such payment on or after such respective date, shall not be impaired or affected without the consent of the Holder.

Indenture § 5.07.

Enactment of Section 316(b) is attributable to the Securities Exchange Commission's concern about the motivation of insiders and quasi-insiders to destroy a bond issue through insider control, and the generally poor information about a prospective

---

payment of the senior debt, rather than waiting until actual bankruptcy of the debtor.
Dee Martin Calligar, *Subordination Agreements*, 70 Yale L.J. 376, 377–78 (1961). The "complete" subordination agreement is a subordination under which no payment of principal or interest on the subordinated debt is permitted so long as the debtor is obligated to the senior creditor, or so long as a specifically identified senior debt remains unpaid.
*Id.* at 378. The distinction between the two has similarly been described as follows:

When subordination is "inchoate," payment of the subordinated debt is not restricted unless and until the triggering event occurs. In contrast, a "complete" subordination permits no payment to be made on the subordinated debt at any time while the senior debt remains outstanding. In other words, a "complete" subordination is effective immediately.
*Culp v. Tri–County Tractor, Inc.*, 112 Idaho 894, 897, 736 P.2d 1348, 1351 (Idaho Ct.App.1987).

reorganization available to dispersed individual bondholders.[5] In 1939, the Commission addressed this concern by seeking to have recapitalizations placed under regulatory and judicial control. *See* Senate Comm. on Banking and Currency, Trust Indenture Act of 1939: Report to Accompany S. 2065, S.Rep. No. 248, 76th Cong., 1st Sess. 26 (1939) [hereinafter *"Senate Trust Indenture Report"*] ("Evasion of judicial scrutiny of the fairness of debt-readjustment plans is [intended to be] prevented by [Section 316(b)'s] prohibition."); *see also* Jerome Frank, *Some Realistic Reflections on Some Aspects of Corporate Reorganization*, 19 Va.L.Rev. 541, 568–69 (1933) (Jerome Frank, later chairman of the SEC, arguing for active court supervision of reorganizations). The Commission accordingly recommended to Congress legislation, in the form of Section 316(b), that would bring contractual recapitalizations under Bankruptcy Court jurisdiction.

Section 316(b) tends to force recapitalizations into bankruptcy court by frustrating a distressed firm's efforts to successfully complete a consensual workout. When a distressed or nearly bankrupt firm seeks to reorganize its financial structure, the incentives among those financially interested in the firm would generally be to contract to the efficient solution and avoid the transaction costs of a bankruptcy proceeding. R.H. Coase, *The Problem of Social Cost*, 3 J.L. & Econ. 1 (1960); *In re Chateaugay Corp.*, 961 F.2d 378 (2d Cir.1992) ("The debtor and its creditors share an interest in achieving a successful restructuring of the debtor's financial obligations in order to avoid the uncertainties and daunting transaction costs of bankruptcy."). In a workout affecting bondholders, however, Section 316(b) tends to frustrate such a consensual workout. By guaranteeing a bondholder's right to receive payment of the principal of or interest on the security, Section 316(b) creates a disincentive for bondholders to exchange their bonds for stock or for bonds with different terms. Bondholders aware of the perceived advantage of refusing to participate in the workout—payment in full after, and if, the recapitalization succeeds—will do so, seeking to benefit from the workout at the expense of those who would renegotiate their credits or offer new capital. The holdouts thus seek to be "buoyed-up" by the workout's participants.

The "buoying-up" effect places the distressed firm under further stress. In order to overcome the effect, nearly equal treatment of bondholders is necessary since equal treatment reduces the incentive for bondholders to hold out.[6] A reduced incentive to hold out enhances the firm's ability to achieve near unanimous agreement on the terms of any contemplated recapitalization and thereby increases the chances of a successful consensual workout. Without equal treatment of creditors, the near consensual unanimity necessary for a successful workout is frustrated by holdouts and the buoying-up effect, and the workout fails. *See Bond Workouts, supra* n. 4, at 234. The Securities Exchange Commission was undoubtedly aware that requiring unanimity in bondholder voting—rather than mere majority action—would frustrate consensual workouts and help induce bankruptcy. And convinced that insiders or quasi-insiders would damage bondholders, the Commission welcomed the prospect. *See Bond Workouts*, at 234 n. 4.

### B. Applicability of Section 316(b)

■ On this motion, the parties have framed the issues such that the Court is called upon not merely to interpret TIA Section 316(b) but, in large measure, to construe provisions of the Indenture which are in apparent conflict with Section 316(b), namely, the subordination provisions of the Indenture's Article 6 (the "Subordination

---

**5.** It is probable that Congress also intended Section 316(b) to reinforce the negotiability of indenture securities. *See* Mark J. Roe, *The Voting Prohibition in Bond Workouts*, 97 Yale L.J. 232, 257–58 (Dec.1987) (hereinafter *"Bond Workouts"*).

**6.** That is, creditors with the same priority would be treated equally but subject to previously established unequal priority arrangements among classes of creditors. *See Bond Workouts, supra*, at 234 n. 4.

454

Clause") and the 60–day notice provision of Section 5.06. Significantly, KCLC admits that TIA Section 316(b) (and Section 5.07 of the Indenture) guarantees UPIC's absolute and unconditional right to recover interest under the Securities, and thus "overrides" the subordination and notice provisions of the Indenture. KCLC thus acknowledges the absolute and unconditional nature of the right afforded a noteholder under Section 316(b), at least with respect to overdue interest. KCLC contends, however, that in this case such right applies only to UPIC's claim for payment of interest and not payment of principal. KCLC argues that, because UPIC's claim for principal is based upon KCLC's failure to repurchase the Notes under a "special" repurchase obligation akin to payment on principal redemption or acceleration (to which Section 316(b) does not apply), Section 5.07 does not afford UPIC an absolute and unconditional right to bring a claim to recover the principal amount of the Notes. KCLC urges that in order to determine whether UPIC is entitled to bring an action to recover the principal amount of the notes, the Court must construe the Indenture's subordination provisions under state law to determine whether the Subordination Clause provides for "complete" or "inchoate" subordination. Similarly, according to KCLC, because TIA Section 316(b) does not apply to UPIC's claim for failure to repurchase the Notes, UPIC lacks standing with respect to its repurchase claim, having failed to give proper notice of default to the Trustee under Section 5.06. The Court thus turns to each of the Indenture provisions KCLC asserts are unimpaired by the TIA.

### 1. The 60–Day Notice Provision

■ Indenture Section 5.06,[7] which is similar in material respects to Section 507 of the American Bar Foundation Corporate Debt Financing Project's *Model Debenture Indenture Provisions—All Registered Is-*

sues—1967, is discussed in the American Bar Foundation's *Commentaries on Model Debenture Indenture Provisions.* These commentaries address the interaction of Model Sections 507 and 508 (the Model Provision analogue of Indenture Section 5.07) in their treatment of Section 507, entitled "Limitation on Suits":

The major purpose of this Section [507] is to deter individual debentureholders from bringing independent law suits for unworthy or unjustifiable reasons, causing expense to the Company and diminishing its assets. The theory is that if the suit is worthwhile, 25% of the debentureholders would be willing to join in sponsoring it. The 25% figure is standard. An additional purpose is the expression of the principal of law that would otherwise be implied that all rights and remedies of the indenture are for the equal and ratable benefit of all the holders.

*Note that this limitation is only on suits under the indenture—the right of a debentureholder to sue on his indenture for payment when due is absolute and unconditional, as provided in 508.*

\* \* \* \* \* \*

Of course, any suit by one debentureholder seeking to collect the principal of his debenture might prejudice other holders who do not bring such a suit *but this kind of action is an absolute right of the debentureholder under the debenture and Section 508 of the Model Provisions.*

American Bar Foundation, *Commentaries on Model Debenture Indenture Provisions* 232–34 (1971) [hereinafter *"Commentaries on Indentures"*] (emphasis added). It is clear that in order to reflect a noteholder's absolute and unconditional statutory right to bring an action for principal and interest due and owing under a debenture, Model Section 5.07 was drafted so as to apply only to actions "under" or "with

---

7. Section 5.06 provides in relevant part:
    A Securityholder may pursue a remedy with respect to this Indenture or the Securities only if: (1) *the Holder gives to the Trustee written notice of a continuing Event of De-*fault; ... [and] (4) the Trustee does not comply with the request *within 60 days after receipt of the request* and offer of indemnity.... Indenture § 5.06 (emphasis added).

respect to" the indenture, and not to actions by a noteholder for payment of principal and interest due under a note. Thus, although KCLC concedes that Section 316(b) "overrides" the notice requirement of Section 5.06, it is more accurate to say that Section 5.06 has no *applicability* to actions brought under TIA Section 316(b), since such actions for principal and interest are brought under the note or debenture. *See Commentaries on Indentures, supra,* at 233 (the right of a debentureholder to sue on his debenture for payment when due is absolute and unconditional under TIA Section 316(b)). Accordingly, to the extent that UPIC's claim for principal is deemed, under TIA Section 316(b), an action under the Note or Security "to receive payment of principal of . . . the Security, on or after the . . . due date[ ] expressed in the Security," the notice requirement of Section 5.06 shall not affect or impair UPIC's right to assert its claim for payment of the principal of the Securities.[8]

### 2. Payment of "Principal" Under the Securities

■ Considering the operative language of TIA Section 316(b), the first clause of the relevant language, "to receive payment of principal of . . . the Security,". refers broadly and unambiguously to the *principal of the Security*, unqualified by the

potential mechanisms under which the principal shall become due and owing; the second clause of that language, "on or after the respective due dates expressed in the Security," is broad, unambiguous, and similarly unqualified except with respect to the requirement that such principal be due and payable on or after the "due date" as set forth in the Security. There is no basis in the plain language of Section 316(b) to interpret narrowly the definition of "principal," or to limit the definition to principal maturing pursuant to a particular mechanism set forth in the Security or Indenture. Similarly, the legislative history of Section 316(b) and the Corporate Debt Financing Project's authoritative commentary on that Section of the TIA, tends to evince Congress' intent to have Section 316(b) interpreted so as to give effect to the absolute and unconditional nature of the right to payment it affords a Securityholder. *See Senate Trust Indenture Report, supra;* House Comm. on Interstate and Foreign Commerce, Trust Indenture Bill of 1939, H.R.Rep. No. 1016, 76th Cong., 1st Sess. 56 (1939).[9]

Considering next the operative provisions of the Securities, it is significant that neither the provisions governing repayment of principal, i.e., Paragraphs "2" and "6" (entitled "Principal" and "Repurchase," re-

---

**8.** The Indenture's Section 5.06, however, although substantially similar to Model Section 507 in most respects, differs from the Model Section in that it contains language purporting to limit the right of a noteholder to sue on the note, in derogation of Section 5.07. Model Section 507 provides in relevant part:

No Holder of any Debenture or coupon shall have any right to institute any proceeding, judicial or otherwise, *with respect to this Indenture* . . . unless (1) such holder has previously given notice to the Trustee of a continuing Event of Default; . . . [and] the Trustee for 60 days after its receipt of such notice, request and offer of indemnity has failed to institute any such proceeding. . . .

*Commentaries on Indentures, supra,* at 232 (emphasis added). Compare Section 5.06 of the Indenture, which provides in relevant part:

A Securityholder may pursue a remedy with respect to this Indenture *or the Securities* only if: (1) the Holder gives to the Trustee written notice of a continuing Event of Default; . . . [and] (4) the Trustee does not comply with the

request within 60 days after receipt of the request and offer of indemnity. . . .
Indenture § 5.06 (emphasis added).

The inclusion of the language *or the Securities* in Indenture Section 5.06, while perhaps intended to frustrate individual Holder suits to enforce obligations arising under the Securities, is in derogation of Section 5.07 and TIA Section 316(b) and, to the extent it purports to limit the right of a Securityholder to bring an action under the Security, has no effect.

**9.** Although the Securities Exchange Commission has recommended modification of certain provisions of the TIA, it has not requested amendment of Section 316(b). *See Reauthorizations for the Securities and Exchange Commission, 1990–92: Hearing Before the Subcomm. on Securities of the Senate Comm. on Banking, Housing & Urban Affairs,* 101st Cong., 1st Sess. 74–75, 128–149 (Apr. 18, 1989). Congress, moreover, in its recent reform of the TIA, made no substantive modifications to Section 316(b). *See* Trust Indenture Reform Act of 1990, Pub.L. No. 101–550, 104 Stat. 2713, 2721.

spectively), nor any other provision, contains an express or implied limitation on what shall qualify as a payment of "principal" for purposes of Section 316(b). Clearly, Paragraphs "2" and "6" of the Securities provide two distinct mechanisms pursuant to which the principal of the Securities may become payable: pursuant to Paragraph "2," KCLC's obligation to pay principal matures as of December 15, 2002; pursuant to Paragraph "6," KCLC's obligation to pay principal matures during the Buy–Back Period, a date certain susceptible of determination by reference to the Indenture.[10]

Although the Securityholder's right to repurchase under Paragraph "6" is drafted not in terms of payment of principal "when due" as under Paragraph "2," but in terms of "repurchase [of the Notes] at a price of 100% of principal amount," this "special" repurchase obligation amounts to nothing less than a demand obligation in favor of the Noteholder to be exercised on the Reset Date in the Noteholder's sole discretion.[11] In this critical respect, the payment of principal pursuant to the repurchase option is, for purposes of classifying the repurchase obligation, no different than payment of principal "when due." [12]

The Indenture, moreover, in defining an "event of default," equates failure to pay principal of any Security upon maturity with failure to pay principal pursuant to an offer to repurchase. Indenture Section 5.01 provides in relevant part that:

An "Event of Default" occurs if:

  \*   \*   \*   \*   \*   \*

  (2) the Company defaults in the payment of the principal of any Security when the same becomes due and payable at maturity, upon acceleration, *pursuant to an offer or [sic] repurchase at the Holder's option* or otherwise....

  \*   \*   \*   \*   \*   \*

Indenture § 5.01 (emphasis added).

The Court therefore concludes that a payment of principal pursuant to the repurchase option contained in Paragraph "6" of the Securities qualifies as a payment of principal to be made on a "due date[ ] expressed in such indenture," within the meaning of Section 316(b). Accordingly, the notice requirement of Section 5.06 neither applies to, nor shall it affect, UPIC's right to assert its claim for payment of the principal of the Securities.

### 3. The Subordination Provisions

■ Having determined that Section 316(b) safeguards UPIC's right to bring this action with respect to both the principal of and interest owing under the Securities, the Court must nevertheless determine the manner in which it may give effect to Section 316(b) while enforcing the subordination provisions of the Indenture.[13]

KCLC contends that although Section 316(b) may guarantee a Securityholder's "procedural" right to commence an action for nonpayment, Section 316(b) does not effect or alter the substance of a noteholder's right to payment of principal and interest under the Indenture and, in particular,

---

**10.** Paragraph "5" of the Note provides for incorporation by reference of the terms of Indenture:
   The terms of this Note include those stated in the Indenture and those made part of the Indenture by reference to the Trust Indenture Act of 1939 (15 U.S.C. §§ 77aaa–77bbbb) (the "Act") as in effect on the date of the Indenture. This Note is subject to all such terms, and the holder of this Note is referred to the Indenture and such Act for a statement of such terms....
   Senior Subordinated Reset Note, Indenture Exhibit "A."

**11.** Although the Court makes no finding on the issue, it would appear that inclusion of the Repurchase Option does not destroy the negotiability of the Securities since, under the Uniform Commercial Code, an instrument is payable at a

"definite time" if it is payable on or before a stated date or at a fixed period after a stated date, at a fixed period after sight, or at a definite time subject to any acceleration. *See* N.Y.U.C.C. § 3–109 (McKinney's 1991). The provisions of U.C.C. therefore appear to encompass both mechanisms pursuant to which the principal of the Securities may become payable "when due."

**12.** The only operative distinction between the provisions, and an obvious one that is of no significance for purposes of this analysis, is the termination of KCLC's obligation to pay interest on the Securities upon a Noteholder's exercise of the repurchase option.

**13.** The resolution of this issue in a case involving an indenture qualified under the TIA is not to be found in any reported decision.

cannot "override" the Indenture's subordination provisions. According to KCLC:

> [The] subordination provisions define [UPIC's] right to payments of principal and interest just as surely as do the provisions of the Subordinated Notes and the Indenture regarding interest rates and payment dates. The provisions of Section 5.07 regarding a Subordinated Noteholder's right to demand payment of principal and interest cannot be divorced from the provisions of the Indenture and the Subordinated Notes which define the scope of that right.
>
> There is nothing in the Trust Indenture Act to suggest that the required provisions of Section 5.07 override the subordination and other provisions of the Indenture.

KCLC Reply Memorandum in Support of Motion to Dismiss the Complaint at 2–3. The Court agrees with these contentions. It does not follow, however, as KCLC urges, that in order to give effect to the Indenture's subordination provisions the Court necessarily must determine whether those subordination provisions provide for "complete" or "inchoate" subordination under New York law. The Court declines this invitation to interpret the Subordination Clause under New York law as the key to construction of the Indenture is to be found within the Indenture itself.

The Court proceeds upon two premises. The first is that UPIC's right to bring an action to recover principal and interest under the Securities is guaranteed by operation of Section 316(b), and but for the Indenture's subordination provisions, UPIC's right to recover the principal and interest due and owing under the Securities would be absolute and unconditional. *See Continental Bank & Trust Co. v. First Nat'l Petroleum Trust,* 67 F.Supp. 859 (D.R.I. 1946). The second is that the Indenture's Subordination Clause is fully enforceable as against the Securityholders, including UPIC. With each of these premises in mind, the Court turns to the provisions of the Indenture.

Examination of the Indenture indicates that many of its core terms, including Section 5.07 and the Subordination Clause, are patterned after the model debenture indenture provisions adopted by the Corporate Debt Financing Project of the American Bar Foundation, all of which have been approved by the SEC as meeting the requirements of the Trust Indenture Act of 1939. *See Commentaries on Indentures, supra,* at 234, 558–66. That the Model Debenture Indenture contains analogues of each such provision strongly suggests that the Indenture provisions KCLC casts in irreconcilable conflict are susceptible of a resolution rendering each compatible with the TIA.

Section 6.01 is the Indenture's general subordination provision,[14] but does not set forth the events which may trigger an "event of subordination," expressly relegating to the balance of Article 6 a description of how the subordination provisions become operative. *Commentaries on Indentures, supra* at 560.

Section 6.02 is the Subordination Clause's first "substantive" provision, governing subordination upon distribution of KCLC's assets to creditors in a liquidation or dissolution of the company, or in a bankruptcy,

---

14. Section 6.01 provides as follows:

The Company covenants and agrees, and each Holder of the Securities by his acceptance thereof likewise covenants and agrees, that the payment of the principal of and interest on the Securities is subordinated in right of payment, to the extent and in the manner provided in this Article 6, to the prior payment in full of all Senior Indebtedness of the Company.

\*     \*     \*     \*     \*     \*

The provisions of this Article 6 are made for the benefit of the holders of the Senior Indebt-

edness, and such holders are made obligees hereunder and they and/or each of them may enforce such provisions directly.

\*     \*     \*     \*     \*     \*

Notwithstanding anything contained in this Indenture to the contrary, all of the provisions of this Indenture and the Securities shall be subject to the provisions of this Article 6, *so far as they may be applicable thereto.* Indenture § 6.01 (emphasis added).

reorganization, insolvency, receivership or similar proceeding.[15]

Section 6.03 governs subordination upon maturity of the Senior Indebtedness or upon a continuing default in the payment of principal or interest on the Senior Indebtedness, and provides:

(a) Upon the maturity of any Senior Indebtedness by lapse of time, acceleration (unless waived) *or otherwise,* all such Senior Indebtedness shall first be paid in full, or such payment duly provided for in cash or in a manner satisfactory to the holders of such Senior Indebtedness, before any payment is made by the Company on account of the principal or interest on the Securities and, *until the Senior Indebtedness is paid in full, any distribution to which Securityholders would be entitled but for this Article 6 shall be made to holders of Senior Indebtedness as their interests may appear,* except that Securityholders may receive securities that are subordinated to Senior Indebtedness to at least the same extent as the Securities (emphasis added).

(b) The Company may not pay principal of or interest on the Securities and may not acquire any securities for cash

or property (other than Securities that are subordinated to Senior Indebtedness to at least the same extent as the Securities) if:

(1) a default in the payment of principal, interest or premium, if any, on Senior Indebtedness occurs and is continuing....

\* \* \* \* \* \*

Indenture § 6.03 (emphasis added).

Section 6.05 governs distributions to the Securityholders during periods when the provisions of Sections 6.02 and 6.03 prohibit such payment. It provides that in the event that KCLC shall make any payment to the Trustee on account of the principal of or interest on the Securities at a time when such payment is prohibited by Section 6.02 or 6.03, such payment shall be held by the Trustee for the benefit of the holders of Senior Indebtedness and paid over to them for application to the payment of the remaining unpaid Senior Indebtedness.[16] Section 6.05 establishes a similar mechanism governing the obligation of Securityholders who receive a distribution, which, because of Article 6, should not have been made to them.[17]

> In the event that the Company shall make any payment to the Trustee on account of the principal of or interest on the Securities at a time when such payment is prohibited by Section 6.02 or 6.03, such payment shall be held by the Trustee, in trust for the benefit of, and shall be paid forthwith over and delivered to, the holders of Senior Indebtedness (pro rata as to each of such holders on the basis of the respective amounts of Senior Indebtedness held by them) ... as their respective interests may appear, for application to the payment of all Senior Indebtedness remaining unpaid to the extent necessary to pay all Senior Indebtedness in full in accordance with its terms, after giving effect to any concurrent payment or distribution to or for the holders of Senior Indebtedness.

\* \* \* \* \* \*

Indenture § 6.05.

**17.** The second paragraph of Section 6.05 provides:

> If a distribution is made to Securityholders that because of this Article 6 should not have been made to them, the Securityholders who receive the distribution shall hold it in trust for holders of Senior Indebtedness and pay it over to them as their interests may appear.

**15.** Section 6.02 provides in relevant part:

> Upon any distribution of assets of the Company (whether cash, securities or other property) to creditors of the Company in a liquidation or dissolution of the Company or in a bankruptcy, reorganization, insolvency, receivership or similar proceeding relating to the Company or its property:
> (1) holders of Senior Indebtedness shall be entitled to receive payment in full of the principal of and interest to the date of payment on the Senior Indebtedness, or such payment shall first be duly provided for in cash or in a manner satisfactory to the holders of Senior Indebtedness, before Securityholders shall be entitled to receive any payment of principal of or interest on Securities; and
> (2) until the Senior Indebtedness is paid in full, any distribution to which Securityholders would be entitled but for this Article 6 shall be made to holders of Senior Indebtedness as their interests may appear except that Securityholders may receive securities that are subordinated to Senior Indebtedness at least to the same extend as the Securities.

Indenture § 6.02.

**16.** Section 6.05 provides:

Section 6.07 governs a Securityholder's right of subrogation in the event that, on account of Article 6, distributions otherwise payable to the Securityholders have been applied to payment of unpaid Senior Indebtedness.[18]

Finally, Section 6.08 governs the relative rights of the holders of Senior Indebtedness and Securities:

> This Article [6] defines the relative rights of Securityholders and holders of Senior Indebtedness. Nothing in this Indenture shall:
>
> (1) impair, as between the Company and Securityholders, the obligation of the Company, which is absolute and unconditional, to pay principal of and interest on the Securities in accordance with their terms;
>
> \* \* \* \* \* \*
>
> (3) prevent the Trustee or any Securityholder from exercising its available remedies upon a Default or Event of Default, subject to the rights of holders of Senior Indebtedness to receive distributions otherwise payable to Securityholders.
>
> \* \* \* \* \* \*

Indenture § 6.08.

Considering these operative provisions of Article 6 as integral component parts, the intended operation of the Subordination Clause becomes apparent. Rather than serve to diminish or impair the rights of Securityholders as against KCLC or function so as to protect KCLC's interests, the Subordination Clause serves to protect the relative rights of the holders of Senior Indebtedness as against those of the Securityholders, without impairing the Securityholders' absolute and unconditional right to payment of principal of and interest on the Securities.

Upon a continuing default in payment of principal of or interest on Senior Indebtedness (as KCLC concedes is the case here), *see* KCLC's Memorandum in Support of Motion to Dismiss the Complaint ("KCLC Mem."), at 2, Section 6.03(b)(1) effects a subordination of the Securityholders' right to payment of principal of and interest on the Securities by directing that any such payment be made not *to the Securityholders* but to or for the benefit of holders of Senior Indebtedness. That Section 6.03 does no more than require that such payments be made to holders of the Senior Indebtedness is evident from Section 6.03(a), which provides that upon the maturity of any Senior Indebtedness,[19] "until the Senior Indebtedness is paid in full, *any distribution to which Securityholders would be entitled but for this Article 6 shall be made to holders of Senior Indebtedness* as their interests may appear" (emphasis added). Section 6.03 thus expressly contemplates the effective enforcement of a Securityholder's right to payment under the Securities during a period when such right to payment is subject to the Indenture's Subordination Clause. Where, as here, a Securityholder has asserted a claim to a distribution to which it would be entitled but for Section 6.03(b)(1)'s prohibition on payment during a period when the Senior Indebtedness is in default and remains

---

Indenture § 6.05.

**18.** Section 6.07 provides:

> After all Senior Indebtedness is paid in full and until the Securities are paid in full, Securityholders shall be subrogated to the rights of holders of Senior Indebtedness to receive distributions applicable to Senior Indebtedness to the extent that distributions otherwise payable to the Securityholders have been applied to the payment of Senior Indebtedness. A distribution made under this Article to holders of Senior Indebtedness which otherwise would have been made to Securityholders is not, as between the Company and Securityholders, a payment by the Company on Senior Indebtedness.

Indenture § 6.07.

**19.** Under a conventional reading of the term "maturity," an obligation "matures" when it becomes due. *See Black's Law Dictionary* 883 (5th ed. 1979). Under the Indenture's Section 6.03, the Senior Indebtedness "matures" by lapse of time, acceleration (unless waived) or by any other mechanism. *See* Indenture § 6.03. As KCLC admits having "been in default on over $250 million in senior bank loans [since early 1991]," KCLC Mem., at 2, the Senior Indebtedness undoubtedly has "matured" within the meaning of Section 6.03.

unpaid, Section 6.05 enforces the holders of Senior Indebtedness' prior right to payment, whether the payment to which the Securityholders "would otherwise be entitled" is paid to the Trustee or, for any reason, to the Securityholder itself. *See* Indenture § 6.05. By operation of Article 6's subrogation provision, Section 6.07, the Indenture preserves the Securityholders' right to payments to which they are entitled under the Securities, which are paid to or for the benefit of the holders of Senior Indebtedness on account of Sections 6.02 or 6.03.

Article 6 is thus structured so as to provide a mechanism whereby, in the event of a default on the Senior Indebtedness, a Securityholder's right to payment of principal of and interest on the Securities is effectively subordinated to the payment in full of the Senior Indebtedness, while preserving a Securityholder's right to payment through subrogation. The Indenture's Section 6.08—which reflects a Securityholder's absolute and unconditional right to payment under the Security under TIA Section 316(b) and Indenture Section 5.07—expressly confirms this construction by providing that nothing in the Indenture shall

> impair, as between the Company and Securityholders, *the obligation of the Company, which is absolute and unconditional, to pay principal of and interest on the Securities in accordance with their terms* ... [or] prevent ... any Securityholder from exercising its available remedies upon a Default or Event of Default, *subject to the rights of holders of Senior Indebtedness to receive distributions otherwise payable to Securityholders.*

Indenture § 6.07 (emphasis added).

The Court therefore holds that the Indenture and Securities are susceptible of a construction which guarantees UPIC's absolute and unconditional right to payment of principal of and interest on the Securities and which affirms the subordination provisions of the Indenture. Accordingly, because Article 6 of the Indenture does not impair UPIC's absolute and unconditional right to payment under the Securities, the complaint adequately sets forth claims for principal and interest under the Securities and KCLC's motion to dismiss pursuant to Rule 12(b)(6) shall be denied.

## II. Motion to Dismiss for Failure to Join the Indenture Trustee

■ Rule 19 of the Federal Rules of Civil Procedure provides for compulsory joinder of parties who are needed for a just adjudication. Under Rule 19

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest.

\* \* \* \* \* \*

Fed.R.Civ.P. 19(a).

KCLC argues that it is subject to a substantial risk of incurring multiple or otherwise inconsistent obligations with respect to the Securities if the Trustee is not made a party to this action. According to KCLC:

> without the Trustee, [KCLC] is not guaranteed protection against the possibility of a judgment in this action that would require it to make direct payment to the plaintiffs, notwithstanding its obligations to senior creditors under [the Subordination Clause]. This risk may only be avoided by joinder of the trustee in order to enforce the subordination provisions of Article 6 of the Indenture, including Section 6.05 which expressly requires the Trustee to hold payment on the Subordinated Notes during a default of senior

indebtedness in trust for the senior creditors.

KCLC Mem. at 12. The Court disagrees.

That a Securityholder chooses to pursue its rights under TIA Section 316(b) and Indenture Section 5.07 in no way implicates any obligation of the Trustee under the Indenture's Article 6 since, unless and until KCLC becomes obligated to make a *payment* to a Securityholder—as under a levy of execution upon a judgment in the Securityholder's favor—no provision of Article 6, or any other provision of the Indenture, requires the Trustee to act to enforce the Subordination Clause for the benefit of the holders of Senior Indebtedness. And contrary to KCLC's contention that the Trustee must be joined in order to guarantee enforcement of Section 6.05, the Indenture plainly counsels otherwise.

KCLC's argument that a judgment in this action would require the Trustee to make direct payment to UPIC thereby creating multiple or inconsistent obligations for KCLC, is patently contrary to the express language of Sections 6.03 and 6.05 which obligate the Trustee to make any such payment directly to the holders of Senior Indebtedness in order to accord them the benefits of the Subordination Clause. Moreover, in the event that any judgment in favor of UPIC in this action were to be satisfied by payment to UPIC, Section 6.05 specifically obligates UPIC to turn over such proceeds to the holders of Senior Indebtedness for application to the unpaid Senior Indebtedness; under Section 6.07, UPIC would then be subrogated to the holders of Senior Indebtedness to the extent of the portion of the Senior Indebtedness paid on account of UPIC's distribution under the Securities. Thus, in arguing that the Trustee is a necessary party to this action, KCLC ignores not only the mechanisms Article 6 provides for effecting and enforcing the Subordination Clause but, more fundamentally, the underlying structure of rights and obligations created by the Subordination Clause which expressly provide that the provisions of Article 6 are for the express benefit of the holders of the Senior Indebtedness, are enforceable by them directly (and without the Trustee),

and obligate Securityholders either to turn over to the Trustee payments that, because of Article 6, should not have been made to them, or to hold such payment *in trust* for holders of Senior Indebtedness.

## CONCLUSION

For the reasons set forth above, KCLC's motion, pursuant to Rule 12(b)(6) and Rules 12(b)(7) and 19 of the Federal Rules of Civil Procedure, for an order dismissing the complaint, is denied. KCLC shall interpose an answer to the complaint within twenty days from the date of this order.

SO ORDERED.