FILED
United States Court of Appeals
Tenth Circuit

August 26, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

MICHAEL A. BRADY,

          Plaintiff - Appellant,

v.

UBS FINANCIAL SERVICES, INC.;
GREATER SOUTHWEST FUNDING
CORPORATION,

          Defendants - Appellees.

No. 06-5228

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. NO. CV-06-0282-CVE-PJC)**

---

Laurence L. Pinkerton, Esq., Pinkerton & Finn, P.C., Tulsa, Oklahoma, for
Plaintiff-Appellant.

Charles A. Gilman, Cahill Gordon & Reindel LLP, New York, New York
(Andrew R. Turner and P. Scott Hathaway, Conner & Winters, LLP, Tulsa,
Oklahoma; George Wailand and Laura C. Fraher, Cahill Gordon & Reindel LLP,
New York, New York; and Reuben Davis, Boone, Smith, Davis, Hurst &
Dickman, Tulsa Oklahoma, with him on the brief), for Defendants-Appellees.

---

Before **KELLY**, **SEYMOUR**, and **MURPHY**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

---

Michael Brady brought suit against Greater Southwest Funding Corporation ("GSW") and UBS Financial Services ("UBS"), which Brady contends is GSW's alter ego, for payment on bonds issued by GSW. The district court dismissed Brady's claims as time barred. This court has jurisdiction pursuant to 28 U.S.C. § 1291 and holds that Brady acquired a right to sue on the Stated Maturity of his bond and that remedy is not time barred. Furthermore, Brady's claims are not barred by res judicata. We therefore **REVERSE** the judgment of the district court.

## I. Background

This action arises out of GSW's 1985 sale of bonds to finance the construction of the Mid-Continent Tower in Tulsa, Oklahoma. GSW is a single-purpose entity created to issue and administer the bonds. GSW issued the bonds in two series. The Series A Bonds were sold to several large institutional investors, while the majority of the Series B Bonds were sold to non-institutional investors like Brady. The bonds were issued pursuant to a Collateral Trust Indenture (the "Indenture"), with Shawmut Bank (the "Trustee") acting as the Indenture Trustee.

The Tower was to serve as the headquarters of Reading & Bates Corporation. It was owned by Fourth Street Associates and leased to RMM Corporation. RMM Corporation subleased the Tower to Reading & Bates for a twenty-five year term. GSW loaned the proceeds from the sale of the bonds to

Fourth Street Associates to finance the tower. In return for the loan of the bond sale proceeds from GSW, Fourth Street Associates issued Series A and B Mortgage Notes, secured by granting GSW a first mortgage interest in the Tower. The collateral also consisted of the assignment to GSW of Fourth Street Associates' interest in the lease and sublease, including the right to receive payment of rent. As required by the Indenture, GSW assigned the Mortgage Notes, the first mortgage interest, the lease, and the sublease to the Trustee as security for the payment of the bonds.

In 1987 Reading & Bates defaulted on its lease obligations. On December 8, 1987, the Trustee provided written notice to all bondholders that an Event of Default[1] had occurred when GSW, which relied on the lease payments to pay the principal and interest on the bonds, defaulted on the payment of principal and interest on the Series A Bonds. Five years later, holders of more than twenty-five percent of the outstanding principal amount of the Series A Bonds notified the Trustee that they were exercising their right under § 9.02 of the Indenture to accelerate all the bonds.[2]

---

[1]An "Event of Default" is defined in the Indenture at § 9.01.

[2]Section 9.02 of the Indenture provides that in the event of a default for payment on one particular series of bond before September 1, 1994, twenty-five percent of the holders of that series alone may effectuate an acceleration of all bonds.

Section 9.02 of the Indenture governs the acceleration of the bonds. That Section states, in part:

> If an Event of Default occurs and is continuing . . . the Holders of not less than 25% in principal amount of the Bonds Outstanding of such series may declare the principal of all the Bonds to be due and payable immediately, by a notice in writing to the Company (and to the Trustee, if given by Bondholders), and upon any such declaration such principal, or, in the case of Zero Coupon Bonds, the Compound Accreted Value thereof, shall become immediately due and payable.

On December 24, 1993, the Trustee informed all bondholders that it had received a Notice of Acceleration from more than twenty-five percent of the Series A Bondholders. In the letter the Trustee explained, "[u]nder Section 9.02 of the Indenture, the principal amount of the Series A Bonds and the Compound Accreted Value (as defined in the Indenture) of the Series B Bonds thereby became due and payable on December 8, 1993."

The Trustee filed a foreclosure action in 1994 in Tulsa County District Court (the "Foreclosure Action") against all parties associated with the transaction, including GSW and UBS. The Trustee asserted claims to collect payment on the Mortgage Notes and to foreclose on its lien on the Tower. The Series B Bondholders, represented by plaintiffs John R. Roberson and David B. Magill, were granted class certification and intervenor status in the Foreclosure Action. The Foreclosure Action is unresolved at this time.

The Series B Bondholders' case in intervention involved claims only against the Trustee. In December of 2005, the Series B Bondholders moved to

amend their complaint in intervention to add breach of contract claims against GSW and against UBS under an alter ego theory of liability. The Oklahoma district court denied the motion on the basis of undue delay. The court later granted summary judgment to the Trustee on all the Series B Bondholders' claims in intervention. The Series B Bondholders appealed that decision to the Oklahoma Court of Civil Appeals. The Court of Civil Appeals reversed the district court's grant of summary judgment and remanded for trial on the Series B Bondholders' claims against the Trustee. It also held, however, that the district court had not abused its discretion in denying the motion to amend for undue delay.

In 1996, Roberson initiated a separate action in state court against GSW, UBS, and others, claiming breach of contract and fraud (the "Roberson Action"). The Series B Bondholders were denied class status in the Roberson Action, but the litigation remains unresolved. In 1997, another Series B Bondholder, Stephens Property Company, brought an action against GSW and UBS in United States District Court for the Northern District of Oklahoma (the "Stephens Action"). Stephens alleged UBS was liable, under an alter ego theory, for unpaid principal and interest on its Series B Bonds. The district court granted the defendants' summary judgment motion on the grounds that the claim was barred

by § 9.11 of the Indenture (the "No-Action Clause"[3]) and, in the alternative, because the plaintiff could not prevail on the alter ego theory.

Brady brought this suit in the Northern District of Oklahoma on May 31, 2006, for payment on the bonds, alleging the same breach of contract claims as alleged in the Roberson Action, the Stephens Action, and in the Series B Bondholders' motion to amend in the Foreclosure Action. The defendants filed a motion to dismiss, arguing the claims were time barred and also barred by res judicata. The district court dismissed the suit on the grounds that the statute of limitations had run on Brady's breach of contract claims.

## II. Discussion

### A. *Statute of Limitations*

Brady claims the terms of the Indenture give him an unconditional right to sue on the fixed date of maturity printed on his bond, regardless of the acceleration of the debt. The defendants maintain that Brady's right to bring suit accrued for statute of limitations purposes when the bonds were declared due and payable in 1993 and has therefore expired. Okla. Stat. Ann. tit. 12, § 95(A)(1). This court reviews de novo the district court order granting the 12(b)(6) motion to dismiss on statute of limitations grounds. *Wright v. Sw. Bell Tel. Co.*, 925 F.2d

---

[3]No-action clauses are a common element of bond indentures and strictly limit the right of bondholders to bring suit in most circumstances. *See* Marcel Kahan, *Rethinking Corporate Bonds: The Trade-Off Between Individual and Collective Rights*, 77 N.Y.U. L. Rev. 1040, 1051 (2002).

1288, 1290 (10th Cir. 1991); *Nelson v. State Farm Mut. Auto. Ins. Co.*, 419 F.3d 1117, 1119 (10th Cir. 2005) ("Whether a court properly applied a statute of limitations and the date a statute of limitations accrues under undisputed facts are questions of law we review de novo."). Because the district court's jurisdiction was based on diversity of citizenship, Oklahoma substantive law governs the statute of limitations question. *See Boyd Rosene & Assocs., Inc. v. Kan. Mut. Gas*, 174 F.3d 1115, 1118 (10th Cir. 1999). This court must therefore "ascertain and apply Oklahoma law with the objective that the result obtained in the federal court should be the result that would be reached in an Oklahoma court." *Blanke v. Alexander*, 152 F.3d 1224, 1228 (10th Cir. 1998) (quotation omitted).

Brady provides numerous justifications for his position. Ultimately, however, his case rests on whether the Indenture provides him with a remedy triggered by the fixed date of payment stated on his bonds. The Indenture sets out the remedies available to the bondholders and the Trustee in an Event of Default. The bondholders are provided with three different remedies.[4] The first of these is the right to accelerate payment of the bonds under § 9.02. Section 9.11, the No-Action Clause, provides a sharply circumscribed remedy to bondholders. Under § 9.11, "[n]o Holder of any Bond shall have the right to institute any proceeding,

---

[4]The Indenture provides the Trustee with additional remedies not at issue here.

judicial or otherwise, . . . unless" certain procedural steps are completed.[5]

Finally, the Indenture provides a more expansive remedy in § 9.12, which states, in part:

> Notwithstanding any other provision in this Indenture, the Holder of any Bond shall have the right which is absolute and unconditional to receive payment of the principal of (and premium, if any) and interest on such Bond on the respective Stated Maturities expressed in such Bond (or, in the case of redemption, on the Redemption Date) and to institute suit for the enforcement of any such payment, and such rights shall not be impaired without the consent of such Holder.

It is this provision that Brady claims guaranteed him an unconditional right to bring suit after his bonds reached their Stated Maturity[6] on December 31, 2005.

As a preliminary matter, we agree with the defendants' position that Brady acquired a right to sue, governed by § 9.11, at the time the bonds were declared due and payable. When a contract provides for acceleration of the maturity of a debt in the event of a default, the statute of limitations will generally run from the date the option to accelerate is exercised. *Bay Area Laundry & Dry Cleaning*

---

[5]Those procedural requirements are: (A) written notice to the Trustee of a continuing default; (B) written request to the Trustee by a majority in principal amount of the outstanding bonds to institute proceedings; (C) an offer of reasonable indemnity to the Trustee by the holders against the costs incurred in compliance with such a request; (D) a failure by the Trustee to act for thirty days after receipt of the request and indemnity offer; and (E) no contrary written request delivered to the Trustee within the thirty days from the holders of sixty-six percent of the principal amount of the outstanding bonds.

[6]Section 1.01 of the Indenture defines "Stated Maturity" as "the date specified in such Bond . . . as the fixed date on which the principal of such Bond . . . is due and payable."

*Pension Trust Fund v. Ferbar Corp. of Cal.*, 522 U.S. 192, 209 n.5 (1997) ("The statute of limitations on an accelerated debt runs from the date the creditor exercises its acceleration option, not earlier."); Richard A. Lord, Williston on Contracts § 79.18 (4th ed. 2007). This general rule is reflected in § 1.01 of the Indenture, which defines "Maturity" as "the date on which the full amount of such principal of such Bond becomes due and payable as therein or herein provided, whether at the Stated Maturity or by declaration of acceleration." The Series B Bonds themselves also explain that "[i]f an Event of Default, as defined in the Indenture shall occur, the Compound Accreted Value of the Bonds may become or be declared due and payable in the manner and with the effect provided in the Indenture." The Series A Bondholders unambiguously exercised the acceleration clause of the Indenture. The Series B Bondholders were informed of the acceleration and that their bonds were "due and payable" in the Trustee's December 24, 1993, letter. As a result, the debt matured in 1993 and the statute of limitations on the remedy provided by § 9.11 ran from that date. Despite this conclusion, the question remains whether § 9.12 provides a separate remedy on which the statute of limitations has not run.

The language in § 9.12 is statutory in origin. It incorporates the language of § 316(b) of the Trust Indenture Act of 1939 (TIA).[7] 15 U.S.C. § 77ppp(b).

---

[7]The Trust Indenture Act provides that "[n]otwithstanding any other
(continued...)

Congress passed the TIA to address the concerns of the Securities and Exchange Commission regarding corporate insiders taking advantage of individual investors. S. Rep. No. 76-248, at 26-27 (1939); *UPIC & Co. v. Kinder-Care Learning Ctrs., Inc.*, 793 F. Supp. 448, 452-53 (S.D.N.Y. 1992); *Zeffiro v. First Penn. Banking & Trust Co.*, 623 F.2d 290, 292-93 (3d Cir. 1980); *see also* George W. Shuster, Jr., *The Trust Indenture Act and International Debt Restructurings*, 14 Am. Bankr. Inst. L. Rev. 431, 433-37 (2006) ("Section 316(b) was adopted with a specific purpose in mind—to prevent out-of-court debt restructurings from being forced upon minority bondholders."). Specifically, § 316(b) was designed to provide judicial scrutiny of debt readjustment plans to ensure their equity. S. Rep. No. 76-248, at 26 (1939). In practice, the provision tends to force recapitalizations into bankruptcy court because of the difficulty of completing a consensual workout. *UPIC*, 793 F. Supp. at 453; Shuster, *supra*, at 437-38. It is also recognized that § 316(b) provides an unqualified, individual right to bring suit for the payment of principal and interest after the due dates for those payments. *See* American Bar Foundation, *Commentaries on Model Debenture*

---

[7](...continued)
provision of the indenture to be qualified, the right of any holder of any indenture security to receive payment of the principal of and interest on such indenture security, on or after the respective due dates expressed in such indenture security, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder . . . ." 15 U.S.C. § 77ppp(b).

*Indenture Provisions 1965 Model Debenture Indenture Provisions All Registered Issues 1967 and Certain Negotiable Provisions which may be Included in a Particular Incorporating Indenture* § 5-7, at 233 (1971) [hereinafter *Commentaries*] ("[T]he right of a debentureholder to sue on his debenture for payment when due is absolute and unconditional, as provided in [§ 316(b)]."); Marcel Kahan, *Rethinking Corporate Bonds: The Trade-Off Between Individual and Collective Rights*, 77 N.Y.U. L. Rev. 1040, 1049 (2002); *see also UPIC*, 793 F. Supp. at 455 ("[T]he legislative history of Section 316(b) . . . tends to evince Congress' intent to have Section 316(b) interpreted so as to give effect to the absolute and unconditional nature of the right to payment it affords a Securityholder.").  Neither party addressed the statutory origins of § 9.12 in their arguments before this court.  As a result, neither has explained the implications of the TIA nor indicated whether § 9.12 is coextensive with § 316(b).[8]

The district court opined that Brady's reliance on § 9.12 was counterintuitive.  It noted, "[t]he Indenture clearly provides that all bonds can mature as a result of the declaration of acceleration.  If that is the case, then it is illogical that the B Bondholders' claim accrued after the declaration of

---

[8]While § 316(b) is mandatory for any qualified indenture, an indenture may provide the bondholders with rights in excess of those guaranteed by § 316(b).  15 U.S.C. § 77rrr(b) ("The indenture to be qualified may contain, in addition to provisions specifically authorized under this subchapter to be included therein, any other provisions the inclusion of which is not in contravention of any provision of this subchapter.").

acceleration and then accrued *again* upon Stated Maturity." The plain language of the § 9.12, however, demonstrates that Brady did have an unconditional right to sue on the Stated Maturity of his bond. The district court's reading of § 9.12 would render it moot after the exercise of the acceleration provision. The provision clearly states, however, that "[n]otwithstanding any other provision in this Indenture" there is an absolute right to payment on the Stated Maturity and an individual right to sue for such payment. Allowing the acceleration clause to eviscerate § 9.12 would be contrary to the "notwithstanding" clause. By its clear terms, the right guaranteed in § 9.12 can only be impaired with the consent of the bondholder. It is undisputed that the Series B Bondholders did not participate in the vote to accelerate the bonds. Nor does the record show any other actions by Brady that could constitute consent to the abrogation of his rights under § 9.12. Section 9.12 offers a separate remedy that is distinct from the remedy offered under the No-Action Clause. That the § 9.11 remedy accrued and its limitations period expired, does not lead to the conclusion that the remedy under § 9.12 was also extinguished. *See Commentaries*, *supra*, § 5-7 at 233 (noting the limitations of a no-action clause apply only to suits under an indenture, not to the absolute and unconditional right to sue on the debenture for payment when due); *Jackson Nat'l Life Ins. Co. v. Ladish Co.*, No. 92-9358, 1993 WL 43373, at *6 (S.D.N.Y. Feb. 18, 1993) (explaining that "acceleration is a collection remedy provided in the Indenture and may not properly be considered a 'payment default'").

The defendants argue that because of the 1993 acceleration of the bonds, there are no longer any "Stated Maturities" since no payment is due at that time. They claim § 9.12 only applies if the default in payment occurs on the Stated Maturity date. In addition to disregarding the "notwithstanding" clause, this argument also ignores the unambiguous definition of "Stated Maturity" set out in the Indenture. Section 1.01 of the Indenture defines "Stated Maturity" as "the date specified in such Bond . . . as the fixed date on which the principal of such Bond or such installment of interest is due and payable." Under this definition it is irrelevant whether the principal actually becomes due and payable on that date. Rather, the Indenture defines Stated Maturity as the date specified on the bond itself, not as a date contingent on a specific set of events.

Section 9.12 was designed to provide an individual remedy to a bondholder, in contrast to the collective remedies outlined in the other provisions of the Indenture.[9] The exercise of this individual right may be to the detriment of other

_____

[9]Arguably, the right to bring suit under § 9.12 is not absolute. Had a court entered a judgment on the amounts due under the bonds, the outcome here might be different. *See* American Bar Foundation, *Commentaries on Model Debenture Indenture Provisions 1965 Model Debenture Indenture Provisions All Registered Issues 1967 and Certain Negotiable Provisions which may be Included in a Particular Incorporating Indenture* § 5-3, at 226 (1971) ("[O]nce a suit by the Trustee goes to judgment for 'the sums due and unpaid' on the debentures, such judgment has the effect of merging into the judgment the rights of all the debentureholders, and separate suits by debentureholders would no longer be maintainable."); *Magten Asset Mgmt. Corp. & Law Debenture Trust Co. v. Nw. Corp.* (*In re Nw. Corp.*), 313 B.R. 595, 600 (Bankr. D. Del. 2004) ("[Section

(continued...)

-13-

bondholders.  As the *Commentaries* explain, however, "any suit by one debentureholder seeking to collect the principal of his debenture might prejudice other holders who do not bring such a suit but this kind of action is an absolute right of the debentureholder under [§ 316(b)]." *Commentaries*, *supra*, § 5-7 at 234.

## B.  Res Judicata

The defendants offer an alternative ground for affirmance of the district court.  They maintain this suit is barred by the doctrine of res judicata because the Series B Bondholders moved to amend their complaint in the Foreclosure Action to include the claims presented here and that motion was denied by the state court.  The district court did not address this issue.  This court, however, may affirm for any reason supported by the record, but not relied on by the district court.  *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 950 (10th Cir. 2002).

"The preclusive effect of a state court judgment in a subsequent federal lawsuit generally is determined by the full faith and credit statute," 28 U.S.C.

---

[9](...continued)
316(b)] applies to the holder's *legal* rights and not the holder's *practical* rights to the principal . . . . [T]here is no guarantee against default."); *Kenton County Bondholders Comm. v. Delta Air Lines, Inc.* (*In re Delta Air Lines, Inc.*), 374 B.R. 516, 528 (S.D.N.Y. 2007) ("[Section 316 (b)] was included in indentures to prevent insiders from renegotiating an issuer's obligations to the detriment of non-insider investors and was never intended to preclude a trustee from procuring a satisfactory compromise, subject to judicial scrutiny and approved by a majority of the bondholders, from a bankrupt issuer.").

§ 1738, which "directs a federal court to refer to the preclusion law of the State in which judgment was rendered." *Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 380 (1985). This court must therefore apply the res judicata rules of Oklahoma. Res judicata is an affirmative defense and the party raising the defense, here the defendants, have the burden of setting forth facts sufficient to satisfy its requirements. *Brooks v. Baltz*, 12 P.3d 467, 469 (Okla. 2000).

Under Oklahoma law, the elements of res judicata, or claim preclusion, are "1) an identity of subject matter, of the parties or their privies, of the capacity of the parties and of the cause of action; 2) the court which heard the original action must have been one of competent jurisdiction; and 3) the judgment rendered must have been a judgment on the merits of the case and not upon purely technical grounds." *Carris v. John R. Thomas & Assocs.*, 896 P.2d 522, 527 (Okla. 1995) (footnotes omitted). To be granted preclusive effect, the judgment must be final and not subject to reconsideration or amendment. *Panama Processes, S.A. v. Cities Serv. Co.*, 796 P.2d 276, 283 (Okla. 1990) ("Under the doctrine of res judicata, only terminal judicial rulings . . . are given preclusive effect." (footnote omitted)); Restatement (Second) of Judgments § 13 (1982). Here, the claims pursued by the Series B Bondholders against the Trustee in the Foreclosure Action resulted in a final order granting summary judgment to the Trustee. That grant of summary judgment, however, was reversed and the matter remanded by

-15-

the Oklahoma Court of Civil Appeals. *Magill v. Shawmut Bank, N.A.*, Nos. 104,317 & 104, 318 (Okla. Civ. App. Jan. 18, 2008).

In the same opinion, the Court of Civil Appeals affirmed the district court's denial of the motion to amend. In affirming, however, it held only that the trial court had not abused its discretion in denying the motion. The claims of the Series B Bondholders against the Trustee are now back before the district court and nothing prevents that court from exercising its discretion to revisit its decision to deny the motion to amend. As a result, the denial of the motion to amend is functionally indistinguishable from any other interlocutory order of the state trial court. Because such orders are "subject to alteration or modification by the trial court before entry of final judgment determining all the issues raised by a claim, [they] can have no binding res judicata effect." *Reams v. Tulsa Cable Television, Inc.*, 604 P.2d 373, 376 (Okla. 1979). Brady's breach of contract claims, therefore, are not barred by the doctrine of res judicata.[10]

---

[10]The first suit need not reach final judgment before a motion to dismiss based on improper claim-splitting can be granted. *Hartsel Springs Ranch of Colo., Inc. v. Bluegreen Corp.*, 296 F.3d 982, 986 n.1 (10th Cir. 2002). The defendants here, however, have not raised a claim-splitting defense. Furthermore, claim-splitting is related to the district court's ability to manage its own docket and the decision to dismiss on that ground is within the discretion of the district court. *See id.* at 985.

## III. Conclusion

For the foregoing reasons, the judgment of the district court is **REVERSED** and the matter **REMANDED** for further proceedings not inconsistent with this opinion. The defendants' motion to file an additional brief is **DENIED**.