MCMAHAN & COMPANY, Froley, Revy Investment Co., Inc. and Wechsler & Krumholz, Inc., Plaintiffs,

v.

WHEREHOUSE ENTERTAINMENT, INC., Louis A. Kwiker, George A. Smith, Michael T. O'Kane, Lawrence K. Harris, Donald E. Martin, Joel D. Tauber, Furman Selz Mager Dietz & Birney Incorporated, Wei Acquisition Corp., Wei Holdings, Inc. and Adler & Shaykin, Defendants.

Don THOMPSON, on behalf of himself and all others similarly situated, Plaintiff,

v.

WHEREHOUSE ENTERTAINMENT, INC., Louis A. Kwiker, George A. Smith, Michael T. O'Kane, Lawrence K. Harris, Donald E. Martin, Joel D. Tauber, and Furman Selz Mager Dietz & Birney Incorporated, Defendants.

Nos. 88 Civ. 0321 (MJL), 88 Civ. 9040 (MJL).

United States District Court, S.D. New York.

Aug. 10, 1994.

Abbey & Ellis, New York City, for plaintiff Thompson and Class; by Arthur N. Abbey.

Howard, Darby & Levin, New York City, for McMahan plaintiffs; by Philip K. Howard.

Weil, Gotshal & Manges, New York City, for defendants; by Dennis J. Block.

## OPINION AND ORDER

LOWE, District Judge.

Before the Court are motions for partial summary judgment and summary judgment filed by plaintiffs and defendants respectively, and a report and recommendation ("R & R") by a United States Magistrate Judge addressing these motions in part. The motions were referred to Magistrate Judge Kathleen A. Roberts who recommends that this Court grant defendants' motion for summary judgment and dismiss the actions against it. For the reasons below, this Court adopts in part and declines to adopt in part this recommendation. Defendants' motion for summary judgment is granted in part and denied in part. Plaintiffs' motion for partial summary judgment is dismissed as moot.

## BACKGROUND

The background of this action is also set forth in the R & R, in prior opinions of this Court, and in an opinion by the Court of Appeals.[1] The plaintiffs in the *McMahan* action, composed of financial institutions, and individual plaintiff Don Thompson in the *Thompson* action (collectively, "Plaintiffs") are holders of 6¼% convertible subordinated debentures (the "Debentures") issued in July of 1986 by Wherehouse Entertainment, Inc. ("Wherehouse"), a retailer of home entertainment and information software. The Debentures are due July 1, 2006. The governing indenture (the "Indenture"), between Wherehouse and Trustee Bank of America, provides debentureholders with a right to tender their debentures at 106.25% of par to Wherehouse upon the occurrence of certain "trig-

---

1. The defendants to the *McMahan* action made a prior motion to dismiss pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. This motion was treated by Magistrate Judge Roberts as one for summary judgment. On May 22, 1989, this Court adopted the recommendation of the Magistrate Judge, grant-
ed summary judgment in favor of the defendants in the *McMahan* action, and dismissed the complaint. On April 10, 1990, the Court of Appeals reversed this decision. *See McMahan & Co. v. Wherehouse Entertainment, Inc.*, 900 F.2d 576 (2d Cir.1990), *cert. denied*, 501 U.S. 1249, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991).

gering events" listed therein. Indenture, § 5.01. One such event occurs when Wherehouse consolidates or merges with another company, unless that merger was approved by a majority of "Independent Directors," a term described in the Indenture. Indenture, § 5.02. This "right to tender" is also described in the prospectus through which the debentures were advertised.

On November 19, 1987, Shamrock Holdings, Inc. ("Shamrock") announced that it would commence a tender offer for Wherehouse's common stock. Subsequently, defendant Adler & Shaykin, an investment partnership, formed defendants WEI Acquisition Corp. and WEI Holdings, Inc., and bid for the Wherehouse stock. On December 20, 1987, the Board of Directors of Wherehouse unanimously approved, with one abstention, a merger with WEI Acquisition Corp. and WEI Holdings, Inc. The merger was announced the following day. Debentureholders were given the opportunity to tender their securities at 50.72% of par.

Plaintiffs attempted to tender their Debentures to Wherehouse following this merger, seeking a redemption price of 106.25% pursuant to the "right to tender." Wherehouse refused to permit Plaintiffs to exercise this right because the board had approved the merger. Plaintiffs commenced their respective suits against the various defendants, including: Wherehouse, various officers of Wherehouse, Furman Selz Mager Dietz & Birney ("Furman Selz") as the underwriter of the Debentures, the merging companies, and the bank financing the offer (collectively, "Defendants").[2]

Plaintiffs claim that they were misinformed about the true nature of the right to tender debentures, that the right was illusory, and that the registration statements and the prospectus, as well as oral representations, were materially misleading. They allege that the right was portrayed as valuable to debentureholders, creating a duty to them on the part of the "Independent Directors," but that they were not informed that the right to tender would not be triggered by a

friendly acquisition of Wherehouse. They allege federal securities claims arising under the following: Section 11 of the Securities Act of 1933, 15 U.S.C. § 77k, for a misleading registration statement; Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*, for a misleading prospectus or oral communication; and Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, for fraud in connection with a sale of securities. In addition, they assert state-law claims based on breach of contract, interference with contract, breach of the implied duty of good faith, and fraudulent conveyance.

## DISCUSSION

The Court will conduct a *de novo* review of the R & R and the parties' motions addressed therein. *See* 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b). A motion for summary judgment must be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The facts are to be viewed favorably to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970). The moving party bears the burden of initially demonstrating the absence of a genuine issue of material fact. *Id.* at 159, 90 S.Ct. at 1609. This burden may be discharged as to issues on which the nonmoving party bears the ultimate burden by showing an absence of evidence in support of essential elements of that party's case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–25, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986). The nonmoving party must then come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986); *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553.

---

**2.** The defendant bank was dismissed without prejudice by stipulation and order filed July 29, 1991.

I. *The R & R.*

At the heart of Defendants' motion and the conclusion of the R & R is § 8.06 (the "No Action Clause") of the Indenture. The No Action Clause provides as follows:

> *Limitation on Suits.* A Securityholder may pursue any remedy with respect to this Indenture or the Securities only if:
>
> (1) the Holder gives to the [Indenture] Trustee written notice of a continuing Event of Default;[3]
>
> (2) the Holders of at least 25% in principal amount of the Securities make a written request to the Trustee to pursue the remedy;
>
> (3) such Holder or Holders offer to the Trustee indemnity satisfactory to the Trustee against any loss, liability or expense;
>
> (4) the Trustee does not comply with the request within 60 days after receipt of the request and the offer of indemnity; and
>
> (5) during such 60–day period the Holders of a majority in principal amount of the Securities do not give the Trustee a direction inconsistent with the request.

Indenture, § 8.06. Section 14 of the Debentures states in relevant part: "Securityholders may not enforce the Indenture or the Securities except as provided in the Indenture."[4]

In a well-reasoned and thorough report, Magistrate Judge Roberts analyzed the law pertaining to "no action" provisions and applied this law to the instant No Action Clause. Magistrate Judge Roberts found the No Action Clause valid and enforceable as to both Plaintiffs' securities and non-securities claims. Because Plaintiffs failed to comply with the No Action Clause, she recommends that summary judgment be granted in De-

fendants' favor and that Plaintiffs' entire complaint be dismissed.

A. *Plaintiffs' Non-securities Claims.*

No action clauses are frequently included in indentures to limit the types of suits arising from those agreements. *See UPIC & Co. v. Kinder–Care Learning Ctrs., Inc.,* 793 F.Supp. 448, 454 (S.D.N.Y.1992) (citing the American Bar Foundation, *Commentaries on Model Debenture Indenture Provisions,* 232–34 (1971)). "These clauses are strictly construed," *Cruden v. Bank of New York,* 957 F.2d 961, 968 (2d Cir.1992), and have been enforced in a variety of contexts in both federal and state courts.

No action clauses have been used as a defense to the following types of debenture-related claims: civil claims brought under the Racketeer Influenced and Corrupt Organizations Act and fraudulent conveyance claims, *see Victor v. Riklis,* 91 Civ. 2897, 1992 WL 122911, at *6 (S.D.N.Y. May 15, 1992) (containing a "no action" clause identical in scope to the instant clause)[5]; actions to accelerate the time of payment on bonds, *see Friedman v. Chesapeake and Ohio Ry. Co.,* 261 F.Supp. 728, 730 (S.D.N.Y.1966), *aff'd,* 395 F.2d 663 (2d Cir.1968), *cert. denied,* 393 U.S. 1016, 89 S.Ct. 619, 21 L.Ed.2d 561 (1969); actions to set aside transfers as violative of a trust indenture, *see Relmar Holding Co. v. Paramount Publix Corp.,* 147 Misc. 824, 263 N.Y.S. 776, 778 (1932), *aff'd,* 237 A.D. 870, 261 N.Y.S. 959 (1933); and actions based on non-payment of coupons on debenture bonds, *see Greene v. New York United Hotels,* 236 A.D. 647, 260 N.Y.S. 405, 407 (1 Dept.1932), *aff'd,* 261 N.Y. 698, 185 N.E. 798 (1933) (securities held subject to the underlying trust agreement, which contained a no action clause). The Court will first determine whether the instant No Action Clause is

---

**3.** Section 8.01 of the Indenture states that an event of default occurs if, *inter alia,* "the Company defaults in the payment of the principal of any Security when the same becomes due and payable, whether at maturity, upon redemption or otherwise[, or] the Company fails to comply with any of its other agreements in the Securities or this Indenture."

**4.** As stated in § 8.07 of the Indenture, debentureholders are excused from complying with the No

Action Clause in suits based on nonpayment of principal and interest on or after the due dates expressed in the Debenture and in suits based on the right to convert to Debenture to common stock. This is a requirement of § 316(b) of the Trust Indenture Act, 15 U.S.C. § 77ppp(b).

**5.** The "no action" clauses in *Victor* and the instant case are broad. They pertain to *any* remedy with respect to the Indenture or Debentures. *See Victor,* at *7, n. 7.

a successful defense to Plaintiffs' state-law claims.

■ Plaintiffs contend ·that the No Action Clause does not apply to their situation because an absolute right to payment arose upon the occurrence of the merger. A no action clause, as stated in § 316(b) of the Trust Indenture Act, may not bar debenture-holders from suing to enforce the payment of principal or interest "on or after the respective due dates expressed in [the debenture]." 15 U.S.C. § 77ppp(b); *see footnote 4.* Section 316(b) pertains to events of payment default where a company has failed to pay out on an indenture security after its maturity date or after an explicit date on which it has come due—in other words, when the right to payment becomes absolute and unconditional. *See UPIC,* 793 F.Supp. at 455 (discussing legislative history of § 316(b)).[6]

The only date of payment explicitly stated in the Debenture on which the right to payment becomes unconditional is the maturity date, July 1, 2006. Plaintiffs do not seek to enforce payment on the Debentures on or after this date; therefore, § 316(b) is not applicable to the instant situation. Plaintiffs' right to tender prior to the due date expressed in the Debenture is analogous to an acceleration of payment of principal and interest, the time of which is not certain and, indeed, may never come. "[A]cceleration is a collection remedy provided in the Indenture and may not properly be considered a 'payment default.'" *Jackson Nat'l Life Ins. Co. v. Ladish Co.,* 92 Civ. 9358, 1993 WL 43373, at *6 (S.D.N.Y.1993). This reasoning holds true for the conditional right to tender, which is subject to a decision by the "Independent Directors," prior to the Debentures' due date. The No Action Clause is not made inapplicable to this situation by means of § 316(b).

■ Plaintiffs contend that, even if it does pertain to their claims, the No Action Clause is unenforceable because it does not appear on the face of the Debentures. Magistrate Judge Roberts found no merit to this contention. This Court agrees. A restriction or condition upon security holders, such as the No Action Clause in the instant case, is enforceable when that restriction is "definite and fairly places the [securityholder] on notice that his [or her] rights to sue *before the stated maturity date* are restricted and conditioned by the indenture." *Friedman,* 261 F.Supp. at 730 n. 1 (emphasis included) (citing *Dunham v. Omaha & Council Bluffs St. Ry. Co.,* 106 F.2d 1, 2 (2d Cir.1939), *cert. denied,* 309 U.S. 661, 60 S.Ct. 513, 84 L.Ed. 1009 (1940)).

*Friedman* involved bonds which referred their holders to the underlying indenture for information on collection remedies prior to the bonds' maturity. Section 14 of the instant Debentures states that "[s]ecurityholders may not enforce ... the Securities except as provided in the Indenture." Debenture, § 14. Just as in *Friedman,* Plaintiffs here, by the plain terms of the Debentures, are forced to rely on the Indenture to enforce their securities. The Indenture contains the No Action Clause which, in turn, refers back to the securities. The Debentures put the Plaintiffs on notice of the No Action Clause, a clause which limits suits for payment of principal and interest prior to maturity only, by referring Plaintiffs to the Indenture.[7]

■ Plaintiffs next argue that the "right to tender" is an individual right, and that the No Action Clause applies to the enforcement of "collective" rather than "individual" rights. This distinction is of no avail to Plaintiffs. Just as the "right to tender" refers to "The Holder" and "Each Holder," so too does the No Action Clause refer to "*A* securityholder['s]" pursuit of a remedy. *See supra.* Regardless of whether the language of these

---

6. The securities in *Upic* became due and owing within a specific time period after a date certain and specified in the securities. *See Upic,* 793 F.Supp. at 450. Thus, § 316(b) applied in that situation. *Id.* at 456.

7. Magistrate Judge Roberts appropriately distinguished *Friedman v. Airlift Int'l, Inc.,* 44 A.D.2d 459, 355 N.Y.S.2d 613 (1 Dept.1974), and *Cun-*

*ningham v. Pressed Steel Car Co.,* 238 A.D. 624, 265 N.Y.S. 256 (1 Dept.1933), *aff'd,* 263 N.Y. 671, 189 N.E. 750 (1934). While both cases addressed the effectiveness of restrictive language on the face of securities, both cases also involved the obligation to pay principal and interest *at maturity.*

clauses refers to individual rights, the right to relief for a breach of an Indenture provision is limited by the broad No Action Clause. The Indenture states that a holder may pursue "any remedy with respect to [the] Indenture or the Securities only if: ... (2) the Holders of at least 25% in principal amount of the Securities make a written request to the Trustee to pursue the remedy." Indenture, § 8.06(2), *supra*. Indentures contain such provisions

> to deter individual debentureholders from bringing independent law suits for unworthy or unjustifiable reasons, causing expense to the Company and diminishing its assets. The theory is that if the suit is worthwhile, 25% of the debentureholders would be willing to join in sponsoring it. The 25% figure is standard.

*UPIC*, 793 F.Supp. at 454 (citing American Bar Foundation, *Commentaries on Model Debenture Indenture Provisions, supra* ). Regardless of whether the "right to tender" is characterized as a collective or individual right, it is does not escape application of the No Action Clause.[8]

■ As a last resort in objecting to the R & R, Plaintiffs seize upon the doctrines of laches and estoppel. They argue that Defendants should be precluded from using the No Action Clause as a defense because it was not raised in their original Rule 12(b)(6) motion to dismiss. *See* footnote 1, *supra*. Rule 12(h) of the Federal Rules of Civil Procedure addresses the "Waiver or Preservation of Certain Defenses." It is true that it may be more efficient to raise all defenses in one motion rather than in successive motions. However, while some defenses are waived if not raised at the first opportunity, such defenses do not include the defense of failure to state a claim upon which relief can be granted. *See* Fed.R.Civ.P. 12(g), (h)(2). The No Action Clause defense is such a defense and cannot be waived.

■ Finally, Magistrate Judge Roberts rejected Plaintiffs' argument "that they should not be bound by the no action provision because the *McMahan* plaintiffs held over 34 percent of the debentures when their complaint was filed.... Plaintiffs cite no authority for the novel proposition that a party to a contract should be excused from complying with a condition precedent merely because it was *capable* of compliance." R & R, pp. 14–15. Plaintiffs do not object to this conclusion. Where no objections have been filed, the Court need only satisfy itself that there is no clear error on the face of the record before accepting the recommendation. *See Walker v. Hood*, 679 F.Supp. 372, 374 (S.D.N.Y.1988); Fed.R.Civ.P. 72 advisory committee's note. The Court finds no clear error in this recommendation and adopts this portion of the R & R.

The Court has addressed all of Plaintiffs' objections to the R & R with regard to the state-based claims, and the Court agrees with Magistrate Judge Roberts' recommendations. The No Action Clause is broad and applies to "any remedy with respect to [the] Indenture or the Securities." Indenture, § 8.06. Plaintiffs did not comply with the No Action Clause, and thus are precluded from suing Defendants on the state-law claims. Summary judgment for Defendants is granted on these claims, and these claims are dismissed.

### B. *Plaintiffs' Securities Claims.*

■ Magistrate Judge Roberts recommends not only that the state-law claims be dismissed, but that Plaintiffs' entire action be dismissed for failure to comply with the No Action Clause. Plaintiffs submit that clauses of this type cannot prevent federal securities claims. This Court agrees.

---

**8.** Plaintiffs object to Magistrate Judge Roberts' finding that the right to tender appears to be a "collective right" since it effects all debentureholders in an identical manner. Plaintiffs argue that "the same could be said of non-payment of principal and interest." Objections to Magistrate's Report and Memorandum in Support of Summary Judgment, p. 17. This analogy is irrelevant to the finding of the Magistrate Judge.

Because of a statutory exception to the No Action Clause, suits to enforce the payment of principal and interest after a debenture's maturity may be brought notwithstanding their characterization as "collective" or "individual." This very specific right was created not by this Court or by Magistrate Judge Roberts, but by the United States Congress. *See* footnote 4, *supra*.

Plaintiffs rely heavily upon a statement by the Court of Appeals for the Third Circuit in *Kusner v. First Pennsylvania Corp.*, 531 F.2d 1234 (3d Cir.1976). That court found that the defendants there cited "no authority for the proposition that a 'no action' provision in an indenture effectively bars a direct action based upon the federal securities laws." *Id.* at 1239. However, unlike the broad clause in the instant case, the "no action" clause in that case prohibited only suits arising under the indenture. *Id.* While the impact of *Kusner* on the facts of the instant case is unclear, this Court does find that actions based on federal securities laws may not be precluded by a "no action" clause of any breadth.

Both the Securities Act of 1933 and the Securities Exchange Act of 1934 contain anti-waiver provisions. *See* Section 14 of the Securities Act, 15 U.S.C. § 77n; Section 29(a) of the Securities Exchange Act, 15 U.S.C. § 78cc. Both Acts provide that "[a]ny condition, stipulation, or provision binding any person ... to waive compliance" with the Acts "shall be void."

The No Action Clause here requires that holders of 25% of the Debentures must request initiation of a lawsuit by the Indenture Trustee; even then, that action is barred if a majority of the debentureholders instruct the Trustee not to sue. It is possible that a debentureholder could be forced to forego federal securities claims under the language of the No Action Clause. Indeed, this is what Defendants ask the Court to find. However, Sections 14 and 29(a) of the Securities Acts void provisions binding *any person* to waive compliance with the substantive protections of those Acts. They do not merely void provisions binding *plaintiffs* to a securities lawsuit to waive compliance with those protections. It is irrelevant that Plaintiffs did not attempt compliance with the No Action Clause prior to bringing federal securi-

ties suits, as the No Action Clause is void in this regard.

Defendants argue that the No Action Clause does not constitute a "waiver," but rather establishes a procedure which must be followed *before* an action may be brought. They attempt to analogize the No Action Clause to an arbitration clause, reaching the conclusion that both are "mere procedural limitation[s]." [9] Defendants' Response to Plaintiffs' Objections to Magistrate Judge's Report and Recommendation, p. 8. Defendants argue that a securities action by Plaintiffs was not precluded by the No Action Clause because they held over 25% of the Debentures at the time this action was commenced. Notwithstanding the truth of this statement, the No Action Clause is impotent with regard to any federal securities claims. If any securityholder is forced to forego his or her rights under the federal securities laws due to a contract provision, then that provision is void. Plaintiffs appropriately reject Defendants' analogy, arguing that "[i]t is difficult to imagine a starker distinction than that between a forum clause, which only controls *where* a claim is brought, and a clause which actually *bars* many claims." Plaintiffs' Objections, p. 20.

This Court holds that, as a matter of law, "no action" clauses in indentures or securities may not be used as a defense to federal securities claims. The No Action Clause in question does not preclude Plaintiffs' federal claims. Defendants' motion for summary judgment on this issue is denied.

II. *Alternative Grounds for Summary Judgment.* [10]

A. *Plaintiffs' Motion for Summary Judgment.*

Plaintiffs have moved for summary judgment on the breach of contract and breach of the implied covenant of good faith claims. As stated in Section I(A) of this Opinion,

---

**9.** Arbitration clauses are enforceable under federal securities laws. *See Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 485–86, 109 S.Ct. 1917, 1922–23, 104 L.Ed.2d 526 (1989); *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 238, 107 S.Ct. 2332, 2343, 96 L.Ed.2d 185 (1987). Arbitration claus-

es were held to be procedural provisions, and not within the ambit of §§ 14 and 29(a).

**10.** The remaining issues were not addressed in the R & R, which relied on the No Action Clause in reaching its conclusion.

*supra,* these claims are dismissed due to Plaintiffs' failure to comply with the No Action Clause. Plaintiffs' motion for summary judgment is dismissed as moot.

### B. *Defendants' Motion for Summary Judgment.*

Defendants contend that several more grounds exist which warrant the entry of summary judgment in their favor. Before addressing these contentions, the Court stresses that there are numerous issues of material fact potentially making summary judgment inappropriate. Many of these issues are genuine and in need of resolution by the finders-of-fact. *See McMahan & Co. v. Wherehouse Entertainment, Inc.,* 900 F.2d 576 (2d Cir.1990), *cert. denied,* 501 U.S. 1249, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991).

#### 1. *Summary Judgment As to All Plaintiffs.*

Defendants contend that they have not, as a matter of law, caused Plaintiffs to suffer damages under §§ 11 and 10 of the Securities Acts because losses in the value of the Debentures were not caused by the alleged misrepresentations in the Prospectus. Defendants state that the market value per Debenture was $1,000 when issued in July of 1986 and only $470 on the business day prior to December 21, 1987—the day the Wherehouse board of directors announced approval of the merger. Plaintiffs counter that they do not seek damages based on decline in market value, but upon their inability to exercise their right to tender at the time of Wherehouse's merger.

#### a. *Section 11 Damages.*

■ Damages under § 11 are measured by the difference between the amount paid for the security and the value of that security at the time suit is brought. 15 U.S.C. § 77k(e). Damages under § 11 are capped at the price at which the security was offered to the public. 15 U.S.C. § 77k(g). Defendants may prove that any portion of a plaintiff's losses are due to a depreciation in value not resulting from the alleged misrepresentation. 15 U.S.C. § 77k(e). Thus, Defendants may show "negative causation" in order to escape liability, while Plaintiffs must show a decrease in value due to fraud.

Plaintiffs claim that Defendants misrepresented in the registration materials the true nature of the debentureholders' right to tender. "[N]otwithstanding the broad discretion which issuers have in assembling and organizing their data, where the method of presentation obscures or distorts the significance of material facts, a violation of Section 11 will be found." *Greenapple v. Detroit Edison Co.,* 618 F.2d 198, 205 (2d Cir.1980) (citing cases). Defendants argue that any alleged § 11 violations did not impact upon the low market value of the Debentures at the time of merger, and that they therefore cannot be held responsible for this depreciation.

Under the very specific facts of this case, a showing of "negative causation" based upon market value is of no defense to Defendants. It is true that a "price decline before disclosure may not be charged to defendants." *Akerman v. Oryx Communications, Inc.,* 810 F.2d 336, 342 (2d Cir.1987) (citing cases). However, Plaintiffs do not seek to hold Defendants liable for this market-decline. Acceptance of Defendants' argument would make § 11 toothless: misrepresentation as to value to be received would be proscribed, but securityholders would be powerless to enforce this proscription.

Plaintiffs seek damages based on the promised value that was lost due to alleged fraud. Plaintiffs attempted to redeem the Debentures at a premium pursuant to the "right to tender." Instead, Plaintiffs received a reduced amount due to the alleged fraud of Defendants with respect to this right. The market is irrelevant to Plaintiffs' claimed economic losses. Obviously, the real market value of the Debentures is less than the premium to which Plaintiffs claim entitlement. Plaintiffs are permitted to seek damages based upon the alleged violation of § 11 of the Securities Act.

#### b. *Section 10 Damages.*

■ Defendants argue that Plaintiffs have suffered no legally cognizable damages under § 10 of the Securities Exchange Act. Section 10(b) requires that plaintiffs prove "loss causation"—a loss in the value of an investment *caused* by defendants' fraud. *Manufacturers Hanover Trust Co. v. Drys-*

**752**

*dale Securities Corp.,* 801 F.2d 13, 20 (2d Cir.1986), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987). Again, Defendants argue that any loss in the value of the Debentures is attributable to the market, and that Plaintiffs are not entitled to "benefit-of-the-bargain damages" based upon the value the Debentures were allegedly represented to have.

Plaintiffs correctly argue that they may be compensated "for economic loss suffered as a result of wrongs committed in violation of the 1934 Act, whether the measure of those compensatory damages be out-of-pocket loss, the benefit of the bargain, or some other appropriate standard." *Osofsky v. Zipf,* 645 F.2d 107, 111 (2d Cir.1981). *Osofsky* involved misrepresentations in a tender offer to shareholders as to the value of consideration they would receive in a merger. The Court of Appeals found that the shareholders should receive the amount which they were told they would receive. *Id.* at 113. The Court established the proper rule to be as follows:

> [T]he benefit-of-the-bargain rule should be applied under the 1934 Act to the limited situation involved in [that] case, where misrepresentation is made in the tender offer and proxy solicitation materials as to the consideration to be forthcoming upon an intended merger.... [G]iving the plaintiff benefit-of-the-bargain damages is appropriate only when they can be established with reasonable certainty.

*Id.* at 114.

The situation in *Osofsky* is not unlike the situation in the instant action. Plaintiffs al-

lege that Defendants made misrepresentations involving their right to tender back Debentures to Wherehouse upon the occurrence of a merger. Under this alleged scenario, Plaintiffs are tantamount to "sellers" of securities who have been promised a specific consideration for their holdings. They claim that they were promised a sum certain upon tendering their securities, but instead they received a lesser amount than promised. Plaintiffs, if they prove their case, are entitled to benefit-of-the-bargain damages, which here can be established with certainty. In other words, Plaintiffs are entitled to the difference between what they were told they would receive and what they actually received, independent of market value.

Defendants argue that the rule of *Osofsky* is one of limited application which should not be applied to "buyers" of securities. They further argue that damages do not become awardable simply because they can be calculated with precision. In support they cite to *Levine v. Seilon, Inc.,* 439 F.2d 328 (2d Cir. 1971), and *Zeller v. Bogue Elec. Mfg. Corp.,* 476 F.2d 795 (2d Cir.), *cert. denied,* 414 U.S. 908, 94 S.Ct. 217, 38 L.Ed.2d 146 (1973), for the proposition that benefit-of-the-bargain damages are available only to defrauded sellers, and not to buyers.[11] While it is true that these two cases do state this, the court in *Osofsky* points out that this was stated in dictum. 645 F.2d at 112, 113.

The distinction between buyers, whose gain is "speculative," and sellers, who are

---

**11.** Defendants also cite *Freschi v. Grand Coal Venture,* 767 F.2d 1041, 1051 (2d Cir.1985), *vacated,* 478 U.S. 1015, 106 S.Ct. 3325, 92 L.Ed.2d 731 (1986), as a recent Court of Appeals opinion standing for the proposition that "a Rule 10b–5 plaintiff can be compensated only for actual damages." The plaintiff in that case was promised tax deductions arising from a tax shelter. When deductions were disallowed, the plaintiff sued under Rule 10b–5. The District Court denied benefit-of-the-bargain damages. 588 F.Supp. 1257, 1259 (1984). The Court of Appeals affirmed finding that "any award in compensation for hoped-for tax savings would be an impermissible award of damages arising from an expectation interest." 767 F.2d at 1051. The Supreme Court vacated and remanded that decision in light of *Randall v. Loftsgaarden,* 478 U.S. 647, 106 S.Ct. 3143, 92 L.Ed.2d 525 (1986) and *Sedima, S.P.R.L. v. Imrex Co., Inc.,* 473 U.S. 479,

105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). The Court in *Randall* found that Congress did not define the extent of the "actual damages" which may be recovered under the 1934 Act, 15 U.S.C. § 78bb(a), and that these "flexible" damages are not limited to the net economic harm suffered by a plaintiff. 478 U.S. at 663. The plaintiff in *Randall* was permitted to receive damages unreduced by tax benefits received.

On remand of *Freschi,* the Court of Appeals did not expressly reverse its decision that "hoped-for" value is not recoverable. 800 F.2d 305 (1986). However, the earlier decision by the Court of Appeals was *vacated* by the Supreme Court and is of no value to Defendants. The entire rule and reasoning of *Freschi* is in doubt. *Randall* teaches that "actual damages" greater than those permitted in *Freschi* may be recovered.

promised a specific price, "lies in the ability to determine the amount of damages with certainty." *Osofsky,* 645 F.2d at 112. *See also Commercial Union Assurance Co. v. Milken,* 17 F.3d 608, 614–15 (2d Cir.1994) (denying benefit-of-the-bargain damages to buyers of partnership interests only because of the absence of a "reasonable certainty" as to what they "would have earned"); *Barrows v. Forest Lab., Inc.,* 742 F.2d 54, 59 (2d Cir.1984) (reading *Osofsky* for the proposition that benefit-of-the-bargain damages are unavailable to buyers only where their determination is "unduly" speculative). Plaintiffs, like sellers, were allegedly falsely promised specific consideration for their holdings upon the occurrence of a merger. The rule of *Osofsky* applies perfectly to this situation.

c. *Scienter under § 10(b).*

■■■■■■ Defendants next contend that they cannot be held liable under § 10(b) because there is no evidence of scienter on their part. Scienter is one of the requirements for liability under § 10(b) and can be established by a showing of intent or recklessness by a defendant. *Royal Am. Managers, Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1015 (2d Cir.1989). "Issues of motive and intent are usually inappropriate for disposition on summary judgment.... In a § 10(b) action, a court may not grant such relief to the defendants on the ground of lack of scienter unless the plaintiff has failed to present facts that can support an inference of bad faith or an inference that defendants acted with an intent to deceive." *Wechsler v. Steinberg,* 733 F.2d 1054, 1058 (2d Cir.1984).

Defendants put forth evidence, especially by way of deposition testimony, to demonstrate this lack of scienter. They submit evidence as to the good faith of Wherehouse's directors and the lack of involvement of outside directors in the issuance of the Debentures. While there is certainly evidence in support of Defendants' case, this Court finds that there is also sufficient evidence in support of Plaintiffs' case from which a jury could infer scienter. The offering materials could be found ambiguous with regard to the "right to tender" and misleading with regard to the Debentures' true value. *See McMahan v. Wherehouse Enter-*

*tainment, Inc.,* 900 F.2d 576, 581 (2d Cir. 1990), *cert. denied,* 501 U.S. 1249, 111 S.Ct. 2887, 115 L.Ed.2d 1052 (1991). This could be found to be the result of intentional misconduct or recklessness by Defendants. Plaintiffs have presented evidence supportable of an inference of bad faith, and it will be for a jury to decide this issue.

2. *Summary Judgment As to Froley, Revy Investment Co., Inc.*

In their original motion, Defendants raise additional grounds for the entry of summary judgment against plaintiff Froley, Revy Investment Co., Inc. ("Froley, Revy"), a party to the *McMahan* portion of this action. These grounds shall be addressed separately.

a. *Section 10(b) "transaction causation."*

■■■■■■ Defendants first contend that they should be granted summary judgment on Froley, Revy's § 10(b) claim because Froley, Revy cannot prove "transaction causation." Like "loss" causation, "transaction" causation must be established before liability can be found under § 10(b). *Burke v. Jacoby,* 981 F.2d 1372, 1378 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 2338, 124 L.Ed.2d 249 (1993). "Transaction causation focuses on whether the alleged fraud *induced* the plaintiff to buy the security," and "can be thought of as 'but for' causation, or reliance." *Perez–Rubio v. Wyckoff,* 718 F.Supp. 217, 238–39 (S.D.N.Y.1989) (emphasis added).

Again, both sides put forth evidence in their support. Defendants give evidence that Froley, Revy based its investment decision on factors other than the "right to tender." However, Froley, Revy gives evidence that the right to tender was "one of the inducements" in deciding to purchase the Debentures and "of some value." September 23, 1992 Deposition of Thomas Revy, pp. 65, 110. Thomas Revy, of Froley, Revy, has also described the right as "important" and stated that he purchased the Debentures based on oral and written representations, apparently regarding the right to tender. March 7, 1988 Affidavit of Thomas Revy, p. 3. Sufficient evidence exists for a jury to infer that Froley, Revy relied on the alleged misrepresentation when purchasing the Debentures. *See*

*Burke,* 981 F.2d at 1378–79. Summary judgment on this ground is denied.

### b. *Timeliness of Froley, Revy's § 12(2) Claim.*

■ Defendants next contend that the statute of limitations under § 12(2) bars Froley, Revy's claims. "No action shall be maintained to enforce any liability created under [§ 12(2) ] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. Froley, Revy commenced this action in January of 1988, the month following the Wherehouse merger which allegedly should have triggered the "right to tender." The § 12(2) claim was added approximately five months later. Oral representations regarding the "right to tender" were allegedly made by a representative of Furman Selz Mager Dietz & Birney Inc. ("Furman Selz"), underwriter of the Debentures, to Thomas Revy in the summer of 1986, eighteen months before the commencement of this action. Defendants maintain that the Prospectus, which was also read at that time, contradicts these alleged statements. Therefore, Defendants argue that Froley, Revy was placed on notice of the alleged § 12(2) violation prior to one year before the action was commenced.

Defendants admit that reasonable diligence is the standard by which the commencement of the statute of limitations is determined. "[O]n a fair reading of the offering materials ... an investor could have reasonably believed that the tender option was presented as a valuable right for debentureholders." *McMahan,* 900 F.2d at 581. The alleged misstatements, as claimed by Froley, Revy in its Amended Complaint, are consistent with this fair reading. *Id.* A reasonable investor, exercising "reasonable diligence," cannot be deemed to be on notice of a § 12(2) violation under these circumstances. Froley, Revy's § 12(2) claim was brought well within the time it should have been discovered.

### c. *Defendants as "Sellers" of Debentures.*

■ Wherehouse argues that it cannot be held liable as a "seller" of the Debentures. Liability under § 12(2) is limited to those who offer or sell securities by means of a materially misleading prospectus or oral communication. 15 U.S.C. § 77l(2). "[T]he term 'seller' must include the person 'who successfully solicits the purchase, motivated at least in part by a desire to serve his [or her] own financial interests or those of the securities owner.'" *Capri v. Murphy,* 856 F.2d 473, 478 (2d Cir.1988) (quoting *Pinter v. Dahl,* 486 U.S. 622, 647, 108 S.Ct. 2063, 2078, 100 L.Ed.2d 658 (1988)).[12] Wherehouse claims that Furman Selz, as underwriter, passed title to the holders of the securities and that therefore no other Defendant can be deemed the seller of the Debentures for the purposes of § 12(2) liability. They argue that no oral misrepresentations were made by anyone from Wherehouse and that the "Independent Directors" played no role in the marketing of the Debentures.

The Supreme Court stated in *Pinter* that despite the existence of courts and commentators who would restrict § 12 liability to those who transfer title of securities for value it does not read that statute "so restrictively." 486 U.S. at 644, 108 S.Ct. at 2077. Plaintiffs point out that when the promoter of securities acts at the "behest" of another party and upon information "supplied" by that party, then the second party may be found to be a "seller" under § 12(2). *See Capri,* 856 F.2d at 478. Title to a security does pass from the issuer to the underwriter, and then from the underwriter to the buyer. *Akerman,* 810 F.2d at 344. Thus, there is no privity between the issuer and the buyer. *Id.* However, if the plaintiff-buyer puts forth proof of scienter, "a person who makes a misrepresentation may be held liable as a 'participant' even though he [or she] is not the immediate and direct seller of the securities." *Id.* (citing *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1298–99 (2d Cir.1973)). "Liability under section 12(2) is available to the buyer of securities against his [or her] immediate seller, and against those who 'substantially

---

**12.** *Pinter* is concerned with § 12(1) of the Securities Act. This case has been held to be applica- ble to § 12(2), as well. *See Capri,* 856 F.2d at 478.

participated' in the sale." *In re CitiSource, Inc. Sec. Litig.*, 694 F.Supp. 1069, 1083 (S.D.N.Y.1988) (post-dating *Pinter* ).

The position of the courts of this circuit and the Supreme Court is contrary to Defendants' position. There need be no direct contact between a plaintiff and defendant, provided that the defendant, with scienter, participated in the sale of securities. Froley, Revy has established a connection between defendant Louis Kwiker, Chief Executive Officer and chairman of the board of Wherehouse, and Furman, Selz in the solicitation of the Debentures. There is no dispute that "Mr. Kwiker participated in the solicitation process." Defendants' Memorandum in Support of Summary Judgment, p. 35. Only the extent of that participation is in dispute. Froley, Revy's evidence is supportable of an inference that Wherehouse and its directors, motivated by financial interests, participated, with scienter, in the sale of the Debentures. While Plaintiffs' evidence may not conclusively establish § 12(2) liability by Wherehouse or Louis Kwiker, Defendants' evidence does not conclusively establish otherwise. Plaintiffs will be given the opportunity to present a case that Furman, Selz acted at the behest of Wherehouse in misrepresenting the value of Debentures and the "right to tender" and in selling the Debentures. Defendants may be found to be sellers of the Debentures.

d. *Application of § 12(2) to Froley, Revy's Aftermarket Purchases.*

 Defendants contend that Froley, Revy's debenture purchases which occurred after the initial public offering (and after the market price of the Debentures had fallen) should be excluded from the § 12(2) claim as a matter of law. In support, they cite to *Ballay v. Legg Mason Wood Walker, Inc.*, 925 F.2d 682, 693 (3d Cir.), *cert denied,* ─── U.S. ───, 112 S.Ct. 79, 116 L.Ed.2d 52 (1991), in which the Court of Appeals for the Third Circuit held that § 12(2) applies only to initial offerings of securities and not to aftermarket trading. This rule has had support in this circuit. *See, e.g., Strong v. Paine Webber, Inc.*, 700 F.Supp. 4, 5 (S.D.N.Y. 1988); *SSH Co., Ltd. v. Shearson Lehman Bros. Inc.*, 678 F.Supp. 1055, 1059 (S.D.N.Y.

1987). However, there is a contrary view that § 12(2) does apply to aftermarket transactions. *See, e.g., Pacific Dunlop Holdings Inc. v. Allen & Co. Inc.*, 993 F.2d 578, 582 (7th Cir.1993); *Farley v. Baird, Patrick & Co., Inc.*, 750 F.Supp. 1209, 1221 (S.D.N.Y. 1990).

Plaintiffs argue that the Court should accept the more expansive view of the applicability of § 12(2). However, it also argues that the Court need not reach this decision at all, and that the Court instead may apply § 12(2) to aftermarket purchases bearing a close relationship to the initial offering. This Court agrees. To establish liability under § 12(2), a plaintiff must have purchased securities pursuant to a false or misleading prospectus. *In re AES Corp. Sec. Litig.*, 825 F.Supp. 578, 592 (S.D.N.Y.1993) (citing cases). While this purchase is often during the initial offering, claims "may be brought by persons who purchased shares 'traceable' to the public offering." *Id.* (relying upon *Barnes v. Osofsky*, 373 F.2d 269, 272 (2d Cir.1967) (stating in dictum that application of § 12(2) is not limited to newly registered securities)).

Where there is no nexus between the aftermarket transactions and a public offering, the weight of authority is clearly that § 12(2) should not be applied to the aftermarket purchases. This is not the instant case. Here, Froley, Revy purchased approximately one-half of its Debentures in the initial securities offering. It can be reasonably inferred that the decision to purchase in the aftermarket was based on information received at the time of the initial purchase, such as from a prospectus or an oral communication. Froley, Revy claims to have made the secondary purchases to reduce the average cost of the initial investment. Defendants do not refute this connection, but instead urge the Court to adopt the blanket-rule that § 12(2) does not apply to aftermarket transactions. The Court rejects this argument and follows the reasoning of *In re AES Corp.* Given the nexus between the initial purchases and the aftermarket purchases, § 12(2) will be applied to all of Froley, Revy's Debentures.[13]

**13.** Defendants make a final argument in their

reply papers that neither Wherehouse nor Fur-

3. *As to the Thompson Class.*

■ Finally, Defendants argue that the claims brought pursuant to § 11 of the Securities Act by Don Thompson ("Thompson") are barred as untimely. The statute of limitations on § 11 claims is the same as that for § 12(2) claims. *See* Section II(2)(b) of this Opinion, *supra.* Section 13 of the Securities Act provides in relevant part: "No action shall be maintained to enforce any liability created under [§ 11] unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence." 15 U.S.C. § 77m. Suit must be filed within one year after the time a plaintiff is in possession of facts objectively sufficient to have placed that plaintiff on inquiry notice of a potential claim. *Bresson v. Thomson McKinnon Sec., Inc.,* 641 F.Supp. 338, 344 (S.D.N.Y.1986) (citing *Ingenito v. Bermec Corp.,* 441 F.Supp. 525, 554 (S.D.N.Y.1977)). Defendants contend that Thompson was on inquiry notice of the facts surrounding his claim more than one year prior to the commencement of his action.

Defendants must meet an extraordinary burden in convincing the Court that summary judgment based on inquiry notice is appropriate. Whether reasonable diligence was exercised by a party is a ordinarily a question of fact for a jury. *In re Integrated Resources Real Estate Ltd. Partnerships Sec. Litig.,* 815 F.Supp. 620, 638 (S.D.N.Y. 1993). " 'When conflicting inferences can be drawn from the facts, ... summary judgment is inappropriate.' " *Id.* (quoting *Robertson v. Seidman & Seidman,* 609 F.2d 583, 591 (2d Cir.1979)). "[I]t is only in 'extreme

circumstances' that summary judgment is appropriate when the defendants assert that the action was untimely commenced because inquiry notice was triggered more than a year before the action was brought by the plaintiff." *Integrated Resources,* 815 F.Supp. at 638 (quoting *Freschi v. Grand Coal Venture,* 583 F.Supp. 780, 785 (S.D.N.Y.1984)). The Court will examine Defendants' motion with these considerations.

Thompson filed this action on December 21, 1988, just within the one year limitations period which began to run upon the announcement by Wherehouse of the merger. Defendants contend that Thompson was on notice of the nature of the "right to tender" on November 19, 1987, when Shamrock announced in a press release that it would make a tender offer for Wherehouse.[14] In that release, Shamrock's president and chief executive officer announced that in the absence of a merger agreement debentureholders would have the right to redeem their debentures at a premium, but if a proposed merger agreement were executed, this right of redemption would not be triggered. The information contained in the release was published on November 20, 1987 in the *Wall Street Journal, Los Angeles Times,* Business Wire, and Reuters. Defendants contend that this announcement should have put Thompson on inquiry notice that his understanding of the nature of the "right to tender," as it relates to friendly acquisitions, might not be accurate.[15]

Again, § 11 provides for civil liability on account of a false registration statement. Plaintiffs contend that the registration statement misstated the right to tender. The

---

man Selz were the sellers of the securities purchased in the aftermarket. While the defense that Wherehouse is not a "seller" was addressed in section II(2)(c) of this Opinion, *supra,* this specific argument relating to after-market purchases was not raised earlier. The Court expresses no opinion as to the merit of this argument. Instead, the Court declines to address the issue as it is inappropriately raised at this juncture. *See In re AES,* 825 F.Supp. at 593, n. 20.

**14.** The merger which allegedly triggered the right to tender followed this offer by Shamrock. *See* Background, *supra.*

**15.** Publication of information in the media gives plaintiffs constructive knowledge of that information. *In re Integrated Resources,* 815 F.Supp. at 639. Additionally, Shamrock filed a lawsuit in California State Court on November 19, 1987, alleging that the Debentures constituted "poison debt" giving the Independent Directors "unbridled discretion" in determining whether the right to tender has been triggered. Defendants argue that this lawsuit also put Thompson on notice. *See Id.; Korwek v. Hunt,* 646 F.Supp. 953, 958 (S.D.N.Y.1986), *aff'd,* 827 F.2d 874 (2d Cir.1987) (citing *Berry Petroleum Co. v. Adams & Peck,* 518 F.2d 402, 410 (2d Cir.1975)).

Court of Appeals found that a rational trier of fact could view the registration materials as misleading. *McMahon*, 900 F.2d at 581. On a "fair reading" of the registration materials, a reasonable investor could have believed that "Independent Directors were to render independent votes on the right to tender based on the impact of a merger and on the interests of debentureholders." *Id.* Clearly, reasonable minds can differ as to the nature of the "right to tender."

Shamrock's conclusions regarding this right were made independently of any specific information provided by Wherehouse other than in the registration materials and Prospectus. It would be unfair to deem Thompson on inquiry notice based upon the subjective conclusions of a third party about the effect of a potentially ambiguous right.[16] This Court is reluctant to deem Thompson on notice of the true nature of the "right to tender" when that notice would have come from the subjective views of a third party. Defendants' motion for summary judgment against Thompson based on the statute of limitations is denied.

## CONCLUSION

For the reasons stated above, the Court adopts in part and declines to adopt in part the Magistrate Judge's Report and Recommendation. Plaintiffs' motion for partial summary judgment is dismissed as moot. Defendants' motion for summary judgment on the claims arising under state law is granted. Defendants' motion for summary judgment on the federal securities claims is denied. A Joint Pre-trial Order is due on or before October 14, 1994.

It is SO ORDERED.

---

16. While Shamrock's press release does indicate a view of the right to tender different from that expressed by Plaintiffs, it appears that Shamrock too was unsure of the effect of that right to tender. On November 19, 1987, Shamrock sued Wherehouse and its directors in California state court alleging that the Debentures constitute "poison debt." Defendants' Memorandum in Support, p. 42 n. 87. Shamrock alleged that "[t]he Indenture leaves unbridled discretion to the Independent Directors in determining whether a Triggering Event is to be approved." *Id.*